Opinions.
—On the first point indicated in head-note (l),as
to change of domicile, the Earl of Selbokxe, after laying down the principle that “ The onus of proving a change of domicile, animo et facto,- lies upon those who assert it;” adverted to the *446 facts in detail, and concluded by saying : “It is not because-a-critical state of health may oblige a man to go, or to remain with the prospect of dying, abroad, that he can be held to have abandoned, either animo or facto, his domicile of ori- ■ gin/’
Upon this point, Lord Fitzgerald added : “The extent to which the -evidence must be carried to put an end to the domicile of origin is explained in clear terms in the Countess of Dalhousie’s Case,* and in Munro v. Munro,† both of which were in this House, and are reported in Clark and Finnclly. It is not upon light evidence or upon a light presumption that we can act, but it must clearly appear by unmistakable evidence that the party who has a domicile of origin intends to part with it and intends to establish his domicile elsewhere.” '
On the point in head-note (3), that the law presumes the necessary prerequisites to have been performed in an apparently regular marriage, the Earl of Selborne said (after -supposing, for the purpose of argument, that banns and license were required by the New York law): “ There is a total absence of proof, direct or indirect, that in this case there was no publication of banns and no license. No doubt there is not affirmative proof, by registers or otherwise, of these things; but the registers of the marriages solemnized by the clergy of Trinity Church were not, at that time, regularly kept, and when they were kept it was not the practice to make any entries in them as to banns or licenses. If these preliminaries were necessary, the rule ‘ omnia, prcesumuntur rite acta ’ makes it your lordships’ duty to presume, under the circumstances of this case, that whatever was necessary was actually done. I cannot myself conceive any circumstances more properly requiring the application of that rule. No doubt this marriage was not (as in some of the cases mentioned at the bar), followed by cohabitation of the spouses, with habit and repute of married persons. That could not be, because the husband died within two days. But the whole object of Richard Maitland and Mary McAdam was to be lawfully married; his, to do justice before his death to his children, and to their *447 mother, then expecting antither child; hers, to obtain that status which nothing but lawful wedlock could confer. It cannot be supposed that they would knowingly neglect any legal requisite of marriage. "Whatever occasion there may have been for promptitude in fulfilling their purpose, it was not done in a clandestine manner ; the officiating minister was one of the husband’s executors, and his other executors (one of them apparently his man of business), were witnesses to the ceremony. The letter of August 4, 1772, shows that he had explained his intention to them beforehand. Dr. Ogilvic, beyond all question, must have known what was necessary for the validity of the marriage ; it was his duty to solemnize it in a legal, and not in an illegal, manner ; and, if the law of 1684 was in force," he would have been liable to heavy penalties if he had done- otherwise. It cannot rationally be suggested that the legal conditions of marriage, whatever they were, were not generally understood by educated Englishmen resident at New York in 1772, and especially by the clergy of the Protestant Episcopal Church there. Dr. Ogilvie himself was married by license. All probability is against the supposition that these things could have been omitted if they were necessary ; and there is nothing from which your lordships ought to infer, either (as far as I can see) that there was not sufficient time for publication of banns after Richard Maitland’s resolution was arrived at, or that there would, at any time before the marriage, have been any difficulty in procuring a license. The question is raised after the lapse of more than a century, and after the death of everyone who knew the real facts. Mary McAdam and her sons enjoyed the status of widow and of legitimate children, respectively, from July 13, 1772 (when Richard Maitland died), for the rest of their lives. The onus of proving that this marriage, solemnized defacto by a minister, and with the rites of the Church of England, was void for want of banns or license, and that (as a matter of fact) there was no publication of banns and no license, rests, in my opinion, upon those who say so. I cannot, myself, see that there is a scintilla of evidence to justify that conclusion."
Lord Blackburn said (after expressing the view that *448 license and banns were not necessary under the colonial law): “But I completely agree with what was said by the noble and learned Earl opposite [Selbobne] as to the general principle, that where there is a marriage proved to have been solemnized defacto one hundred and ten years ago, by people who intended that it should be a good marriage, who did it all bona fide and openly, every presumption ought to be made in favor of anything that was requisite having been done, if there was anything requisite, to give it validity and sanction. And consequently, if I thought that a license was necessary,—which I do not,—I think we ought infer that there was a license.
“I may observe, that although I say that I do not think a license was necessary, it does not, to my mind, by any means follow that there was not, or might not be, good ground for thinking that a license was, in fact, taken out. Dr. Ogilvie, although he might probably think that he would not be much blamed for performing the marriage in this way without a license, would know that he was doing something at least irregular, if a license was required and one had not been obtained, and, therefore, that it would be much safer and better to get a license; and, accordingly, one would probably have been got. If the marriage had been questioned a year or two afterwards, that would be no reason, I think, for assuming contrary to the fact, that there had been a license ; but it is an excellent reason, at the end of one hundred years, for not upsetting the marriage without any evidence at all, except merely the absence of affirmative evidence for presuming that there was not a license.”
On this point,Lord Watson said : “The actual celebration and subsequent repute of marriage are completely established, and the legal presumption, which in these circumstances arises in favor of marriage, the opposing claimant cannot rebut except by disproving every reasonable probability that there could have been an antecedent license.” He accordingly concurred in the opinion that the opposing claimant had failed to discharge himself of that burden. Lord Watson added (on the effect of family repute): “ At this distance of time, the family repute of marriage is an important item of proof in support of the fact of marriage ; but family belief or opinion *449 as to the legal effect of that marriage on the status of the claimant, which is purely a question' of law, cannot affect the decision of this case.”
• Lord Bramwell said: “ The maxim upon which we ought to act has been mentioned by his Lordship [Earl of Selborne] and I will not repeat it. With regard to the question that those things took place which are to be presumed, the burden of proof rests upon those who say that they did not take place. It is to be presumed that the requisites of a valid marriage existed; it is for those who deny that to show that they did not exist. My Lords, instead of their having shown that to my satisfaction, I am satisfied upon the evidence that those requisites did exist. I am satisfied upon the evidence that there was either a publication of the banns here, or, what I should think much more probable, a license; and for these reasons. The practice undoubtedly was to have either banns or a license—that is-proved beyond doubt. It is proved that Dr. Ogilvie himself was married by license. And the more Mr. Asher proved what I may call the necessity, or the propriety, or the practice6 of there being a license or banns in this case, the more, to my mind, he proved that there was either the one or the other of those two things, because, as the noble and learned Earl by my side has said, this was not a case in which the parties were hurriedly marrying to gratify some impatient passion, and perhaps taking no very great pains as to whether things were strictly conformable to rule or not, but it was a deliberate business-like matter done by persons who knew what they were doing, who knew that the law, or at all events knew what was supposed to be the law; it was not done clandestinely, and I think that if anybody were asked at this moment to say why, if the law or the practice was to have a license or a publication of banns, there was none in this case, it would be utterly impossible to give a reason why such license or banns did not exist in this particular case. The suggestion has been made that the marriage was upon death-bed and in somewhat of a hurry ; but it was not in such a hurry that a license could not have been obtained. Then I say, here is a quiet deliberate marriage, not clandestine, a marriage with witnesses, and entered into with the object of *450 making the lady a valid widow, if I may use the expression, so as to entitle her to a pension; it seems to be impossible to' suppose that under those circumstances the parties would not have provided themselves with the necessary license or banns.
“Then, in addition to that, we have the evidence that the marriage was recognized, not in words but in fact by all the relations, and by the Crown, who treated the marriage as having been a marriage validly contracted.
“ Now what is the evidence against these considerations,— which to my mind are as cogent as any which I ever met with in support of any proposition ? The only suggestion is that there is no record either of banns or of a license ; and-there is not. Now that might be a valid consideration to some extent (it would certainly not be all powerful) if it were shown that there was a regular record of marriages or of banns or licenses, and that there was an omission to mention the banns or license under which these people got married. But there is nothing of the kind. It is a remarkable circumstance that there is no record from which it can be said that a mention of these matters is missing. On the contrary, inasmuch as we see- that there are some mentions of licenses granted and no mention of any banns, or evidence of any banns, and that there are other cases where there is evidence of banns, but no evidence of a license, it follows that there were sometimes licenses of which there is no record, and sometimes banns of which there is no record. Then we have to suppose in this particular case (and it is a reasonable supposition too, considering the paucity of instances in which there are records of any of these transactions) that the thing took place, but that there was no record either of the license or of the banns which had been given.”
Lord Fitzgerald (after commenting on the significance of the family recognition of the marriage, and suggesting, as an explanation of there being no register of the marriage, that none was kept for a series of years, and of the marriage certificate not being contemporaneous—that it was given for the purpose of application to government and not inconsistent with the existence of an ordinary certificate since lost,) said: “Upon those facts there can be no doubt that the principle *451 applies, which was so clearly laid down in strong and unmistakable language in the case of Piers v. Piers, 2 House of L. Cas. (Cl. & F.) 331, in this House, which had already been clearly stated in an earlier branch of the case by Lord Plumelet, that when the fact of a marriage, which was an apparently legal marriage, is established, the law presumes, until the contrary is plainly and clearly established, that all that was required to give it legal validity and force took place.
“ I should prefer, my Lords, in place of dealing either with the opinions of American lawyers, or with the Duke’s Laws, or with the Act of 1084, to rest upon that settled and satisfactory doctrine of law in this case, that when once the fact of the celebration of an apparently legal marriage is proved, it is to bo presumed that everything has been rightly done until' the contrary is established by some unmistakable proof.”
On the subject of head-note (4), the distinction between a • law prescribing the formalities of marriage disregard of which avoids the marriage, and one, the disregard of which only involves penalty, Lord Blackburn said : “We must' remember what has been so pointedly and strongly laid down by many judges with regard to the law of marriage, that! although it may be enacted that a marriage which could otherwise have been °a good marriage, shall not in future be a good marriage, unless there be this or that attached to it, the burden is upon those who say that such a thing has been enacted to show distinctly that it has been enacted. A case before Dr. Lusiiington was cited, in which ho said that' so strongly as that the words of the enactment should be positive and absolute in order to have that effect. I am inclined to think that he went a little too far, if he said as much as that; but that the burden rests strongly upon those who deny the validity of a marriage, to show that the enactment clogged marriage with a condition precedent, and did not merely establish a penalty upon the persons who did what was irregular and improper, is, I think, quite clear.
“My Lords, viewing it in that light, I think the law of H584 did not do more than say that if a marriage is good in England, as this marriage by Dr. Ogilvie would unquestion *452 ably have been if it had taken place in England, nevertheless, if it is performed here, the minister who performs it shall be subject to penalties unless there is a license or banns. And further, I think it would almost follow as a self-evident matter that a clergyman who was performing a marriage in New York at that time, when the voyage from London occupied so long that he could not be reasonably expected to get a license from the bishop, who was his ecclesiastical superior, namely the Bishop of London, I think it would almost follow that getting a license from the governor of the colony would be sufficient. Certainly, the distance would have led the Bishop of London to think that he ought not to punish Dr. Ogilvie for an ecclesiastical irregularity in performing a marriage if he had a license from the governor.
“ My Lords, looking at it all together, it appears to me to come to this : whether Dr. Ogilvie would have been punishable or not, the marriage was good if it was in fact performed.”
Lord Watson said : “On the assumption that in 1112, the marriage-law of the colony was regulated, solely, by the Duke’s Act of 1684, which requires that marriage shall be preceded, either by publication of banns, or a license under the hand and seal of the governor, that act does not appear to me to make nullity of a marriage entered into without these preliminaries, one of the penalties of its contravention. It enacts that ‘ If any man shall presume to marry contrary to the law prescribed, the person offending shall be proceeded against as for fornication.’ It does not enact that he shall be proceeded against ‘ for fornication,’ of which offense he would undoubtedly' have been guilty, if there was no marriage, but that he shall be subject to the same penalties as if he had committed the sin of fornication. The enactment superseded the previous law upon the same subject passed in 1664, which expressly provided that the children born of such a marriage should bo reputed bastards. The omission of that penalty in the Act of 1684 is very significant, and its significance is not diminished by the fact that one of the penalties attached to fornication was ‘by injoyning marriage.’ The only other penalties attached to fornication wore fine or corporal punishment, *453 neither of which could imply that the marriage was to be annulled ; and it appears to me to be impossible to hold that an injunction to marry, in the case of actual fornicators, must be read as an injunction to dissolve a marriage already contracted, in the case of persons who were to be punished in the same way as if they had been guilty of fornication.”!
On the question in head-note (5), very fully discussed by counsel but not passed upon by the Lords, as to the condition of the colonial laws, Lord Selboeee only adverted to it to concede for the purpose of argument that the colonial laws required banns or licenses.
Lord Blackburn, upon this question, spoke as follows: “ It is to be remembered that the question is not what was the marriage law of the State of New York subsequently to 1772, although, inasmuch as after the Declaration of Independence the United States adopted all the previous legislation, it would be very material if it could be shown that, whilst the law of the State of New York was the same as that of the Province of New York had been, any American courts of the State of New York had held that a license or banns were essential to the validity of a marriage in that State. That would have shown that in their opinion,—and they certainly had very good means of knowing the fact,—that had been the law of the Province of New York. But, so far from that being the case, we find that, from 1692, when the first Charter from William and Mary went out to New York, down to the time when the whole law of the State of New York, as one of the United States, was changed in, I think the year 1828,* and when a quite different law was substituted, during the whole of that period there is no indication of any decision by an American court, and, so far as I can perceive, no indication of an opinion expressed by an American lawyer, that a marriage in New York would not be valid unless there was either a license or banns.
“ Now, my Lords, I first start with this proposition of law ; *454 it was questioned by Mr. Asher, I think, in the course of his argument, but I believe" the authorities upon the matter are uniform: when the province of New York was founded by the English settlers who went out there, those English settlers carried with them all the immunities and privileges and laws of England. The Englishmen in a province which had been so settled were as free Englishmen with as much privilege as those who remained in England. It is true that it is only the law of England as it was at that time that such settlers carry with them. Subsequent legislation in England altering the law does not affect their rights, unless it is expressly made to extend to the province or the colony. It is equally true that in all the books or dicta in which that rule is laid down there is always a qualification put upon it somewhat of this sort: the settlers who go out carry out the law so far as it is applicable to their new situation. That is a vague and general kind of phrase, but I think it has sound sense in it. That being so, from the time when the colony of New York was first settled it had primd facie the marriage law of England, such as it was in the latter part of the seventeenth century— such as it was from the time of the accession of Charles the Second, we will say, until the English Revolution in 1688. It is quite sufficient for my purpose to take those dates. There is no' doubt whatever, I believe, on the part, of any English lawyer," that a marriage in England at that time solemnized according to the form of the Church of England and by a clergyman of the Church of England, such as Dr. John Ogilvie was, was valid to constitute matrimony; although, if it was a clandestine or irregular marriage without banns or a license, the clergyman who performed it might be liable to censure from his ecclesiastical superior, and to punishment by his bishop, and probably to punishment in the ecclesiastical courts, yet the marriage was good.
“ Taking that, my Lords, as the first step, the real question seems to be:—Is there shown to be here any ground for holding that- the law of England such as it was in England had been modified in New York previously to 1772 ? From the time of the Revolution and the accession of William and Mary downwards, there is not a pre *455 tense for saying that it had been so modified. But it is said that it might have been changed or modified before, during the time when James, Duke of York, had had this province as a patentee by virtue of the authority from the Crown given to him by his brother, Charles the Second. Now, I think that to some extent, such changes or modifications of the law might have been made under a patent of that sort. I think it.is pretty obvious, when you consider it, that, when colonists first set out from this country to a new place, they cannot be expected to take out with them all the machinery of the law ; they cannot take out with them judges, and justices of the peace, and quarter sessions, and everything of that kind that is established in England, and consequently there is a time when they must do justice in a manner which may be described as rough and ready. I therefore, by no means say, that Charles the Second had not full power by his prerogative to .say that during the time whilst the necessity (I think that is the phrase used in the patent), of the colonists required it, they should make ordinances and such things for the purpose of governing the people at that time, provided always (and this provision is carefully inserted), that those ordinances are to be not inconsistent with, or repugnant to, the law. of England. I think a tolerably good instance of what was done (I do not say that it would have been all quite right, or that everything could have been justified if it had been questioned) is afforded by a case which was cited, which occurred in the year 1674, when the courts were not regularly formed, and when they proceeded in a very rough mode at once to divorce a man from his wife, to punish him for adultery, or rather for bigamy with a second wife whom he had married, and to punish him for having committed perjury. At that time all that.was quite right, except the divorce, as to which it may be doubted whether they had power to make one. In substance it was all right enough, but in form it was as rough as could be. I do .not say, that if there had been any proceedings taken against them for taking such steps, they might not have been upset; but there would have been something to be said in favor of those who were responsible for the proceedings. But no one would for a moment sup *456 pose that such a proceeding as that would be carried on into the law of New York after it had become an established province, and still less that it would be carried on into the law of New York when it had become one of the United States.
“ Now, my Lords, I think that if- under that authority the governor acting under the Duke of York afterwards had taken upon himself to say, ‘ Here are men and women who want to be married, we have no bishops, wo have no clergy,’—if that was the fact (I think, probably they had, but it is possible to suppose that he should have thought that and said it), ‘ They cannot be married according to the law of England. I will take upon myself to say that they shall be married in some particular way, although that may not be according to the law of England.’ Supposing he had done that, I should say it was within the spirit of the law, and whether it would be good or not would be a matter for after-consideration. But if he had intentionally and deliberately said, 1 The law of England is that such and such marriage shall be good ; but I choose to say that, here in New York it shall not be good unless something else is added,’ I am clear that that would have been ultra vires of his authority, and even James the Second, although he considered his prerogative to be extremely extensive, and carried it very far, would have hardly said that such a thing was within the authority which he could exercise.
“ Now, my Lords, with regard to what are called the Duke’s Laws, so far as they bear upon marriage,* it seems to me that, whatever they- were intended to say about marriage otherwise, they were not intended to say that a marriage which would be good in England shall be bad if celebrated in Now York. I do not think that was meant, and if if was I am quite sure that it would not have been adopted. However, I do not think it was meant.
“ Then comes the law of 1684, which has been so often referred to.† I doubt exceedingly, after what we have hoard whether it can be properly said that that law of 1684 was adopted into the law of the province of New York afterwards. *457 It seems to have been pointedly repudiated by the first Assembly which sat, and it seems to have been never—for about seventy or eighty years at all events, and I think more —printed as a law in any of the collections of the Statutes that were printed, and I doubt if it was ever adopted as a law of New York at all. People who have been making historical researches after the law of New York was changed have discovered those documents, -which have been produced before us, which I have no doubt are genuine documents ; but I have not seen the slightest reason to think that this law had óver been incorporated into or adopted in the law of the province of New York whilst it was a province, or of the State of New York before they changed their laws in 1828.”
Lord Watson on this subject, said : “ Notwithstanding the assistance which has been given us by able and erudite lawyers from the other side of the Atlantic, I have felt great difficulty in forming a satisfactory opinion as to the precise state of the marriage law in the colony of New York in the year 1772. That is not, in my opinion, so much a question of American as of English law ; although American lawyers are probably more familiar than ourselves with the legal history of the colony, and the decisions of the courts of New York, after the Declaration of Independence might throw some light upon the law administered in the colony before their institution ; but the American decisions, to which we have been referred, are of a date long subsequent to the Declaration of Independence, and are by no means conclusive ; and the learned gentlemen who have been examined before us differ so much in opinion that I have satisfaction in thinking that it is not necessary to undertake the task of deciding between them. Apart altogether from the interesting controversy which is raised by their evidence, there appear to me to be sufficient materials for the decision of the present case.
“His Majesty,King Charles the Second, in making a grant of the colony to his brother, the Duke of York, in March, 1664, directed him to govern the inhabitants aeeordingtosueh laws, orders and ordinances as should be by him established, and, in default thereof, according to the good discretion of his *458 deputies ; but so as such ordinances and proceedings ‘ be not contrary to, but as near as conveniently may be agreeable to the laws, statutes and government of this our realm of England.’ The terms of the letters-patent clearly indicate that the law of England was to be the basis of the colonial law ; artd that no departure from it was to be permitted in any substantial particular. In my humble opinion, what your Lordships have to ascertain, for the purposes of this case, is not what law ought to have been enforced in the colony in 1772, but what law. was de facto recognized and administered at that time.* It would, in my opinion, be a monstrous proceeding to bastardize a whole generation of colonists, whose parents had married in reliance on the law as then administered, because the authorities to whom its admistration was committed had misinterpreted, or failed to give effect to, the provisions of an ancient statute. The impression which I have derived from the evidence is, that, in the year 1772, the Duke of York’s Acts relating to marriage were not in force, and that the marriage law of the colony was substantially the same with that prevailing in England. One thing is certain : that some of the provisions of the Duke of York’s Act of 1684,†which it was the duty of the government to enforce, if the act was in observance, such as the establishment of a ■county register, for preserving in perpetuam rei memoriam, all certificates of proclamation of banns and of marriage, were in complete abeyance.”
Lord Watson added, however, that on the assumption that the Duke’s Act of 1084 Avas in force,, it did not annul a marriage Avhich disregarded it.
The "other lords expressed no opinion upon this question.
In conclusion, it Avas resolved without dissent that Frederick Henry Maitland had made out his claim.
*459 Note on Colonial Law.
Opinions of eminent American counsel had been taken, and on the trial, Hon. Edwakd J. Phelps, American minister in London, and Hon. George P. Edmunds, U. S. senator, testified on the question of American colonial law.
Limits of space forbid giving any of these statements in full, but I here endeavor to condense for the benefit of those having yet to make research in the same field, the very valuable statements as to the law and authorities thus made.
Stephen P. Nash, of New York, of counsel to Major Maitland.
Question I. What system relating to marriage prevailed in New York in 1772 ?
My opinion is, that according to the law then prevailing, a contract of marriage made per vería deprtxsenti, was to all intents and purposes a valid marriage, though made without formal solemnization by a clergyman or magistrate, because,—The constitution of 1777, art. 35, ordained that such parts of the common law, &c. , . . . as “ formed the law of said colony on April 19, 1775,” should “ be and continue " the law of the State, subject to. further alterations. In Fenton v. Reed, 4 Johns. 52, decided in 1809, Kent, Oh. J. (afterward chancellor, whose doctrine in that case has been followed to the present time, 2 Kent's Com. 87), settled the rule for New York, that by the common law of England ceremonial marriage is not essential; and as intermediate legislation shows, this must have been the law in 1772, and the different conclusion arrived at in The Queen v. Millis (10 Clark & F. 534), does not alter the rule for New York established in Fenton v. Itecd (supra), and ever since adhered to.
The only other view is the supposition that the law of Holland became under Dutch colonists tbe law of the New Netherlands, and remained the law of the colony after conquest, till 1770. But though the Dutch colonists, in all their dealings with each other, may naturally have been governed by the laws of Holland, yet the population was mixed. England always claimed the territory by discovery, and after its conquest from the Dutch, English laws were considered as the basis of its jurisprudence. In the capitulation by the Dutch in 1664, there was no saving of general laws and customs, except in some specified particulars, as in the XI, Art.: “ The Dutch here shall enjoy their own customs concerning their inheritances.” In the Charter of Liberties granted by the Duke of York in 1683, though the common law of England was not in terms introduced, the entire framework of the government, and particularly of the courts of justice with their modes of procedure, was patterned after the “ usage, custom, and practice of *460 the realm of England,” and this is the case in all the patents and instructions to the governors subsequently administering the affairs of the colony, and in the colonial legislation; and that the English common, law superseded the Dutch law, is clearly implied from the constitutional provision that it should continue the lar? of this State. How much of the common law of England was. adopted, not by direct legislation, but impliedly, has not been judicially determined in New York, except in a few particulars. It has been decided that the law of ancient lights, as administered in England, was not applicable to a new country, and has never been adopted in New York. The law of waste by cutting timber, as expounded in England, has not for the same reason always been applied in New York, though the principles of the rule are upheld. But the prevailing opinion is, I think, that expressed by Chancellor Walworth in Bogardus v. Trinity Church (4 Paige, 178), that the law of England became the law of the colony, “ being brought hither by our ancestors, who emigrated to this country from England ” (p. 198). I feel quite sure that the marriage laws of Holland were not those which would have determined in the courts of the colony of New York, a marriage solemnized in 1772 ; as I am not aware of any judicial decision in the State of New York, or in any other State where the Dutch had important settlements, in which it has been adjudged that the Dutch law prevailed after the surrender to the English.
Question II. What bearing, if any, have the so-called Duke’s laws on the validity of a New York marriage in 1772 ?
In my opinion, that these and the provisions of the act of 1684 ceased to have any validity after the revolution of 1688, or rather after the government of the colony became settled under William and Mary.
The first legislative assembly of the colony after the revolution of 1688 met in 1691, and immediately took action to abrogate the laws passed under the authority of the Duke of York (1 Smith's Hist, of N. Y. 112-115. This author was a leading colonial lawyer and member of the council in 1769. To same effect is Jackson v. Gilchrist, 15 Johns. 89, and Van Winkle v. Constantine, 10 N. Y. 422). I have not been able to discover the slightest evidence that at any time during the eighteenth century, compliance with the formalities of the act of 1684 was deemed in the colony or State of New York essential.
I am also of the opinion that the Marriage Act passed in 1684 superseded and repealed the Dutch law so far as that was then operative, and became the law on the subject until 1091. The abrogation of that act in 1691 would not, I think, be considered as reviving the law of the conquered people, but as leaving the common laws of the country, to which the colony then owed allegiance, to govern the subject.
*461 Joel P. Bishop, of Massachusetts, of counsel to Major Maitland.
I. The Duke’s laws continued in force only till the English revolution. They do not, however, contain express words of nullity so as to invalidate a marriage in contravention thereof. 1 Bish. Mar. & Div. (6th Ed.) § 283.
II. There are no reports of judicial proceedings on this subject prior to Fenton v. Reed (4 Johns. 52), which held that a marriage per verba de prasenti was as valid as if in facie ecclesim. The constitution of New York continued the former common law. Art. 35, Const. 1777, R. S. N. Y. (1st Ed.) 37.
III. It is well known that in New York and all the British colonies there were certain colonial usages which became parts of the common law, and which survived the revolution. In New York some of these were of Dutch origin.
Into all the American colonies which constituted the original thirteen States of the United States, the English common law of marriage was introduced without legislation; modified, in a few of them, by colonial usages and statutes, in ways not affecting the present question.
But in all of them, it was the common law as it existed prior to Lord Habdwicke’s act (26 Geo. 2, c. 33); and the interpretations given it accord with those in Dalrymple v. Dalrymple (2 Hag. Con. 54). The opinions which prevailed in The Queen v. Millis (10 Ct. & F. 34) have never been accepted in New York or in any other of our States. Hence, beyond any room for doubt, it required in New York in 1772, only the present consent of two persons competent to marry, to constitute a valid marriage. No third person need have been present even to witness it. No copula need have followed.
Theodore W. Dwight, of New York, of counsel to Major Maitland
I. Locus regit actum : marriage is no exception. The law of marriage in N. Y. in 1772 was founded on English common law, unless changed by the Duke's laws. A marriage in 1772 is a question of “ colonial law,” N. Y. being then subject to the British crown.
II. Was the colonial law of New York the English common law ? For it may be urged that the marriage is governed by the Roman Dutch law. What would be the rule of the Roman Dutch law ? For the purpose I refer to Tan Leeuwen's Commentaries on the Homan Butch Law, 1820, book 1, ch. 14, § 3, p. 72. In case of necessity, the rules as to banns and other prescribed ceremonies may be deviated from, and the death-bed marriage would seem to furnish such a case. If, then, the Roman Dutch law prevailed in New York in 1772 (which I emphatically deny), still there is the best authority for holding that *462 Adjutant-General Maitland . . . was lawfully married according to any such system,
III. There is certainly a distinction in some law-books as to the prevalence of the English common law, depending on whether the colonial territory was acquired by discovery or conquest. 1 Bl. Com. 108, says the American plantations were acquired by conquest. But this theory does not now prevail in America. 1 Story Const, c. 16; Tucker's Bl. appendix, 332; 1 Chalmers' Annals, 676; Cooley's Bl. note 17, 107, 108. But even assuming Blackstone is right, and that New York was acquired by conquest, in course of time the Dutch law ceased to have any application. Chalmers' Col. Op. 230, 231, Attorney General Yorke.
The N. Y. constitution of 1777 (art. 35), adopts the common law of England, and makes no allusion to the Dutch law, See 1 Story Const, c. 10, near the close, as to law of New York.
V. There is uncertainty as to the extent of the common law adopted here, but not in respect as to its rule as to marriage. Cheney v, Arnold, 15 N. Y. 345, 349; Hayes v. People, 25 N. Y. 390, 397. Should it be objected that the New York courts mistook the common law (The Queen v. Millis, 10 Cl. & F. 534, decided that at common law a priest was necessary), the real inquiry is what is the view of the highest New York courts. English decisions after the revolution are not binding here.
VI. Was there any statute changing the common law in New York ? The Duke’s laws were done away with at the “happy revolution ” by a resolution of the colonial assembly, April 24, 1691. Van Winkle v. Constantine, 10 N. Y. 422.
On April 28, 1691, a bill was brought in, empowering justices of the peace to marry. If the Duke’s laws were in force, this was unnecessary. All the editions of the Colonial Statutes begin with the year 1691. See also Jackson v. Gilchrist, 15 Johns. 89, 91; Constantine v. Van Winkle, 6 Hill, 177. It may possibly be claimed that the colonial officials in England did not concur in this view. But this cannot be shown.
VII. Nor do I think a New York marriage in 1772 void for want of registration. Lord Hardwicko’s act, 26 Geo. 11, c. 33, did not extend to the colonies. Cheney v. Arnold, 15 N. Y. 345, 349.
VIII. The Duke’s laws did not, however, lose their effect because cf the accession of James II., nor do I think that the doctrine of a law losing its force by disuse ever prevailed in this State.
James C. Carter, of Now York, of counsel to Major Maitland.
The colony of New York had been, long prior to the year 1772, a *463 dependency of the British crown. The laws published in 1664 by the Duke of York contained provisions upon the subject of marriage, which followed the then existing law of England so far as was practicable.
In 1684 a statute of the colonial assembly re-enacted the same provisions with some unimportant changes.
I do not find that this act was subsequently and prior to 1772 repealed. I am of the opinion that a compliance with tire requirements prescribed by the act was necessary to constitute a valid marriage . . . and that a failure to comply with the preliminary steps would
carry with it the consequence that the subsequent marriage was void. But I do not think a failure to comply with the requirements subsequent to this ceremony would render the marriage illegal or void.
[The rest of Mr. Carter’s opinion follows the same line of reasoning subsequently adopted in the House of Lords—that assuming the law of New York in 1772 to have been regulated by the act of 1684, yet if the factum of marriage was proven by Dr. Ogilvie’s certificate, all the other acts required by the act of 1684 would be presumed, and the burden of showing a non-compliance with the act was on the party asserting such non-compliance.]
Testimony of Hon. Edward John Phelps, Envoy Extraordinary and Minister Plenipotentiary of the United States to Great Britain, sworn at the request of the House. After preliminary statements as to his qualifications as a practitioner in Vermont and New York, and the courts of the United States, and professor of law at Yale college, and after stating in effect that the common law of England recognized and established in New York did not require ceremonial marriage, he said, on his cross-examination :
I understand the courts of New York to have held in several cases that the colonial acts, as well as what are called the Duke’s laws, prior to 1688, prior to the revolution in this country, ■were not in existence, at "any rate after 1691; they had no force or validity after that, at any rate. One judge, I would add, if I recollect rightly, suggests the question whether the Duke’s laws ever had any constitutional existence.
Is that on account of the resolution which was passed by the House of Assembly in 1691 ?
Partly on account of that resolution, which the courts treat not as a repealing act, because it does not appear to have been concurred in by the Senate, or approved by the Governor. The courts treated it as a declaration upon the part of the House that those laws had no existence, and they further based their decision upon the fact mentioned by Mr. Nash, that in several collections of revisions which were made by the authority of the legislature, which were directed to comprehend all *464 that wore in existence, they have been omitted; they never have been printed, and never have been recognized as existing laws.
Has your attention been called to the opinion expressed in the case of Humbert v. Trinity* Church, to which Mr. Nash referred ?
. It has; but not until I heard it mentioned here.
Perhaps it would be hardly fair to ask you to consider it without having a previous opportunity of referring to it. ■ Was Your Excellency present when Mr. Nash was examined ?
I heard his evidence.
Did you hear him say that the dictum referred to in the case of, Jackson v. Gilchrist was founded upon the supposition that the resolution of 1691 was an act of Parliament ? '
I have not so understood; the decision was that the courts recognized the fact that it was not valid as a statute, but they treat it as one piece of evidence, perhaps historical, in connection with the omission of these acts from the various collections, going to show that they were not recognized as having any validity, at any rate after 1691. I think they say after the revolution of 1688.
Has your attention been directed to the effect of the Marriage Act of 1684? Is it present to your mind that the Marriage Act of 1684 required either publication of banns, or else a license from the Civil Governor ?
Yes.
At the Declaration of Independence, the license from the Civil Governor would cease to have any eSect; is not that so ?
Yes.
And would that account for there being no licenses after that date ?
It might.
Have you examined as to the fact whether licenses were habitually granted up to the jrear 1775 ?
I have never made any such examination.
Arc you aware whether it is the fact or not 8
Not from any examination of my own. •
^ Assuming it to be the fact that a large and increasing number of ■licenses wore granted in each year up to 1775, and that no licenses are found to have been granted afterwards, would not the explanation of it be that the license of the civil governor had ceased to have any effect when he ceased to be a civil governor ?
That is a matter of inference ; it might be so.
Supposing there«are regular records of licenses granted by the civil governor for the marriages of persons in the State of New York, up to *465 and including 1775, can you refer me to any law under which those licenses were granted other than the act of 1684 ?
I cannot; I am not aware of the existence of any such law.
(Lord Chancellor.) I should like to ask Tour Excellency one question : would or would not the governor of New York, or whatever at the time of Independence was the title of the office of chief magistrate of the city, succeed generally to the duties of the civil governor ?
He would, in my judgment.
Clarence A. Seward, of New York, of counsel (Seward, Da Costa & Guthrie, agents) to Sir James Maitland.
1st. "What was the Marriage Law in force in New York in 1772?
The question propounded is one of fact. As such, it is to he decided by evidence, and not by opinion. In resolving it there are but two sources of evidence to which resort can be had : (1.) The statute law of the period, if any. (2.) Such universal usages and customs, if any, as tend to prove both the existence of the statutes, and the observance thereof. • The usual third source of evidence, to wit, the decisions of contemporaneous judicial tribunals cannot be resorted to, for the reason that there are no reports of such decisions now extant.
íf there were no statute law in force at the period in question, which can now be evidenced by its production, and proof of its observance, then, in view of the historical fact that New York was, at the period indicated, a British colony, the question might arise, if there were no British statutes applicable to the colonies which regulated the marriage condition, whether such condition was not to be considered as being regulated by the common law of England. If such question can arise, then it will be for the courts of Great Britain, as the courts of the parent country, to decide what was then the law of the colony; and if it was the common law of the parent country, then further to decide what such common law was.
On these two questions the decisions of the courts of the United States do not seem relevant. Those courts, so far as the crown of England was concerned, were revolutionary tribunals. As such, they had and have no power to render a decision which can control an English tribunal, either upon the question of what was or is the English common law, or upon the further question whether such law did or did not obtain in an English colony at the time when it was a recognized dependency of the British crown.
The cases which permit a marriage per verba de presentí are all referable to the law of the State of New York, not to the law of the Province. Hynes v. McDermott, 82 N. Y. 41, 46.
They make no reference to the facts that the courts in England *466 have held that the common law did not recognize such marriage. The Queen v. Millis, 10 Cl. & F. 534; Beamish v. Beamish, 9 Ilo. Ld. Cas. 274; Catherwood v. Caslon, 13 M. & W. 267.
The Dane professor of law at Harvard, Theophilus Parsons, questioned the accuracy of the theory that the common law ever tolerated a marriage per vería de presentí (New American Cyclopaedia of 1803), and Massachusetts holds otherwise. Milford v. Worcester, 7 Muss. 48, 53; Commonwealth v. Munson, 127 Mass. 459.
After the Reformation marriage ceased to be a sacrament, and became a status; New York was a protestant colony. N. Y. Entries, II. 1; New England, II. 149.
The provisions of the canon law conferring upon the clergy alone the power to marry (Canon 62 of 103; Ayleffo Paregon Juris Canoniei Anglicani, 101), and creating the obligation of banns or license never became part of the law of New York. Burtis v. Burtis, Hopk. Ch. 628; 3 R. S. § 8, p. 2332; L. 1830, c. 320; Campbell v. Crampton, 8 Abb. N. C. 363.
The Dutch and English, early in the history of New York, legislated in favor of the sanctity of marriage. N. Y. Col. MSS. IV. 466; V. 197; XVI. 40. The Dutch required banns or license. Fiscal v. Doxy, decided in 1674; Fiscal v. Fabricius, 2 Cot. Doc. 691; decided in 1674; Sebring v. De Ronde, decided in 1769, by the Dutch Synod.
“ When the English obtained New Netherlands (N. Y. Col. MSS. Doc. III. 796; N. Y. Papers, III. D. 29), all the power to pass laws devolved on the Duke of York (Patent from Charles II.), and the Duke’s laws regulated marriage. The governor granted marriage licenses. General Entries, I. 95, 98 ; IV. Id. 25.
Under the instructions to Governor An dross (3 Col. Doc. 218, 226, 260), the Duke’s laws were recognized; so in the case of Governor Dongan. 3 Col. Doc. 260, 329.
On the 30th September, 1682, James, Duke of York, instructed Governor Dongan that all laws should be made indefinite. N. Y. Col. Hist. III. 332; N. Y. Entries, CII. 41.
At the second session of the first assembly was enacted a marriage law. Oct. 1684. This law was approved. 8 Doc. relating to Col. Hist. 390.
This law was never repealed until December 28, 1828, although it fell into desuetude at the time of the Revolution; but for the law of 1684 there would have been no authority for the universal colonial custom of banns or license.
The force of the law is manifested by four facts. (1) Observance. (2) Only authorization to magistrates to perform ceremony. (3) Records of the churches. (4) Records of the State showing observance. *467 [In illustration of these records, Mr. Seward presented tabulated results of his examination of thousands of entries of marriages solemnized in various parishes in New York and vicinity within the period in ques tion. ]
The amendment to the Duke’s laws in 1685 provided for punishment of fornication (not an offense at common law. Smith v. Minor, 1 N. J. L. (Cox) 16; Anderson v. Commonwealth, 5 Randolph, 627: Commonwealth v. Isaacs, Id. 634). The marriage act of 1684 provided “that if any man shall presume to marry contrary to the law prescribed, he shall be proceeded against as for fornication.” This law was enforced. 2 Council Minutes, October 4, 1716. Now, if there had been a lawful marriage, persons could not be proceeded against fei fornication. Therefore, the penalty of a violation of the marriage law was to avoid the simulated marriage, and bastardize the issue. These were words of nullity in the statute.
The Resolution of the lower house of assembly in New York on April 24, 1601, was a legislative nullity, it not being concurred in (2 Brodhead's Hist. N. Y, 643; 3 Col. Doc. 324) by the governor or council. This concurrence was necessary. 3 Col. Doc. 624.
Whatever the English law of marriage may have been, it never gained a foothold here, for when the colony was captured by Great Britain, it found the Dutch law of marriage in full force. The Dutch law remained in force until regularly superseded by the Duke’s laws, the Nicolls Codes, and the Marriage act of 1684. These were anticipatory of like laws enacted in England in 1753. 26 Geo. II. c. 33.
It is doubtful whether prior to°1776 the law of England obtained a foothold. 3 Col. Doc. 357; 2 Brodhead's Hist. N. Y. 423.
The earlier decisions of the State of New York fell into the historical error of assuming that the Resolution of the lower house of assembly of April 24, 1691, ever became effective as a law of the colony. Such -was not the fact. The State of New York did not publish the documents relative to the colonial law until after these errors had been promulgated.
The effect of the colonial laws was to invalidate a marriage consummated in New York in 1772 without banns or license.
The laws of 1665 and 1684 contained words of nullity. Milford v. Worcester, 7 Mass. 48, 56.
William M. Evarts (of New York), of counsel for Sir James Maitland.
I. The matrimonial law pertinent to this inquiry had its origin in and was accepted and acted upon by the community under (1) the Dutch law, until the transfer of government to British authority; *468 (2) the Duke of York’s establishment of government and laws, under the grants of Charles II.; and (3) the act of General Assembly of the Province in 1684, and which continued in force at least until the American Devolution. I am not able to discover that, at any time when these successive explicit regulations of marriage were in force, “a common law ” marriage, dispensing with these regulations, was recognized as valid either by law or custom within the province; nor; in my judgment, has there ever prevailed any distinction between a marriage to a particular extent valid, carrying certain personal consequences only as between the jDarties, and a perfect marriage {vei'um mutrimonium),
’ with all the incidents that belong to marriage, affecting personal relations and legal relations to property and inheritance. A marriage here was always either good or not' good to all intents of that institution. The communities were small, and social good order and purity were deemed more important than questions of inheritance and property; and a strict rule was reasonable and practicable. Conquest docs not import the 'laws of the conquering nation, but accepts the laws and institutions as it finds them, except and until it changes them by abrogation or enactment. It seems, therefore, quite natural that, in so grave a matter as the matrimonial law, the Dutch regulation and its motives should be respected, and that it would require to be changed by and according to positive legislation. There is little doubt then that the common law of marriage in England never came in here by the mere presence of the English settlers, but the Dutch law of marriage suffered no innovation, except by some express or implied or customary change in the same. To come down now to the date of 1772, I am not disposed to agree to the proposition that the Duke of York’s laws were not in force in the province after the revolution of 1688. Upon a very careful exploration of the statute books and the legislative records, and giving deserved weight to the opinion expressed in Jackson e. Gilchrist (15 Johns. 89), to the contrary, I am convinced that the historical evidence which induced that conclusion was incomplete,- as well as misconceived and misapplied. But the question whether the Duke of York’s laws as a body were in force in 1772, in its application to the matter now in hand, becomes immaterial, as the statute of Assembly in 1684 unquestionably was in force in 1772.
The essentials of a valid, marriage, according to the laws of the State of New York in 1772, were that the ceremony should be performed by a minister or a justice of the peace, and that such marriage could be lawfully performed only after the publication of the bánns . prescribed by the act of Assembly of 1684, or, in default of such publication of banns, by a license from the governor. It was not necessary that the ceremony should be performed in a church, or that *469 the marriage should be followed by cohabitation, as conditions to the validity of the marriage. The provision of the act of 1684, that the authority to a minister or justice of the peace to perform a marriage is imparted only upon condition of the previous publication of banns, or instead thereof a license from the governor, and the separate enactment “ that if any man shall presume to marry contrary to this law prescribed, the person offending shall be proceeded against as for fornication” in my judgment makes any marriage “ contrary to this law prescribed” void. Denouncing an omission of the formalities as punishable as fornication, denounces the marriage itself as null and void. A status of marriage is not produced; therefore the connection is meretricious.
II. In my opinion the Duke’s laws remained in force unabrogated by the revolution of 1688, the regulation of marriage being superseded, however, by the act of 1684.
III. Dr. Ogilvie’s certificate is not, according to New York law, competent evidence, and if it were it would have to be proved for the purpose.
IV. The recital in it that the marriage was according to the rites and ceremonies of the Church of England as by law established would be interpreted in our courts upon the same principle of reason and authority as would govern in the English courts. There are no decisions in our courts bearing on this clause. As a matter of general reasoning, “the rites and ceremonies” of a church, do not include, it seems to me the legal and official requirements to the validity of the marriage.
. Hon. George F. Edmunds, called and sworn as a witness on behalf of Sir James Maitland [after preliminary statements as to official position, as Senator, and President of the Senate, and practice in the courts of the United States, of Vermont, and of New York, and the fact that in 1772 Vermont was a part of the province of New York;] testified as follows:
In your opinion, what was the law on the subject of marriage in force in the colony of New York in the year 1771 ?
I think it was the Colonial Act of 1684.
In your judgment, was that statute in force in that year ?
I think it was ; I believe it was. I ought to add, that it is really a question of historical research and speculation more than anything else, from the circumstance that there were no decisions of court during that period that are accessible to anybody without a very long and exhaustive research, so that all one has to found upon (as the *470 phrase is) is the history of those times and the condition of society at that time, &c......
It has been suggested that the Resolution of 1691 had the effect of repealing the previously existing statute of 1684. In your judgment, is that so ?
It is not so in my opinion.
Do you know of any legislative enactment repealing the statute of 1684 until 1829 or 1830 ?
I have no knowledge of any other, or information or belief.
In your judgment, could that statute of 1684 be rendered inoperative by anything except a repealing legislative enactment ?
(Lord, Blackburn.) That is upon the assumption, of course, that it was already in force ?
(Mr. Jeune.) Yes, assumimg that it was already in force.
(Witness.) Assuming it to have been in force, I am not acquainted with any process of legislation in America, either as a province or under its present system, whieh would get rid of the statute otherwise than by its being regularly repealed by the same authority, actual or successive, that enacted it. . . .
Are you aware, without going into anything like the number of licenses, that a large number of licenses were granted up to, say, the year 1775 or 17771
I have seen the officially printed documents, collected and printed under the authority of the State of New York, whose capital is now the repository for all these colonial affairs, which contain long lists of such things. Their number or the space of time they cover I am unable to state.
Do you know whether or not by any chance, as one would naturally suppose to be the case, there was a fee_ to be paid on taking out a license of that character ?
I believe these laws provide for it; certainly the Duke’s laws do. I do not remember as to the laws of 1684.
Can you tell their Lordships, as far as regards the passage which has been read to them from Humbert «. Trinity Church, 24 Wend. 587, what the question before the court was in that case ?
It is not easy, as their Lordships would see if they examined the case, to state precisely what the questions were, as the argument of counsel is not printed in extenso. The principal question appeared to be the effect to be given by the court of equity, as distinguished from a court of law, to the statute of limitations; and as a part of that, and in some way connected with it apparently, from the argument and the opinions of the court, an attempt to get over the statute of limitations was made by showing that by Dutch law (a very long time before that *471 case even) the state of things would have been such as would create a fraud, which would enable the claimant to get rid of the effect of the ■ statute of limitations; and that topic the judges discuss, so far as they think it necessary to the purposes of the case.
What was the view taken by the court in that case as to the validity of the statute of 1683, which was referred to ?
The court appeared to be of opinion that that statute of 1683 (if that is the date) operated to fix rights and to continue the operation of society in the manner it purported to do; and they appear to have been of the opinion that the effect of the English succession to the Dutch power there, and the English government then set up, changed and modified, according to the nature of each case as it arose, the preceding Dutch law.
(Lord Watson.) Will you just explain, when you refer to “the court ” how many judges expressed that opinion ?
So far as I now remember, only two opinions were read, although the court was composed of a large body of gentlemen, it being 'ki its autonomy very much like the House of Lords, consisting of legal gentlemen, judges and lay gentlemen.
Did both of those judges who delivered the opinions decide to that effect?
I should imagine so in substance, but in different language; and one of the judges appeared to have directed his attention chiefly to the matter of the statute of limitations and to have passed over this question of Dutch pedigree and so forth, which was insisted upon, upon one side, as being of very little importance, while the next judge or senator who delivered an opinion enlarged more upon that topic.
We have only heard hitherto of one judge. We have not heard as yet of a second judge in that case who said anything upon the point. You say that in substance another did refer to it ?
(Mr. Solicitor-General.) Judge Cowen, the first justice, does not seem to have alluded to it at all.
( Witness). I think there is one expression m Judge Cowen’s opinion that refers to it. I do not remember how many opinions were read. [Referring to the Report.] Judge Cowen delivered the first, and what, in our practice, is called the leading opinion. Hr. Senator Fur-man delivered the next one, and Mr. Senator Lee delivered an opinion, and Mr. Senator Livingstone also.
(Lord Watson.) The committee were informed that one lay senator had expressed himself to that effect, and that the other judges, as I understand, had not expressed any opinion themselves.
My impression is that Mr. Justice Cowen, who was one of the judges refers to the topic but very briefly in speaking of the changes that were *472 continually made in the laws of the province by changing from Dutch law to English law, and so on, in those turbulent and transitional times, and the difficulty of ascertaining at any precise moment what the state of things was. Ido not understand that Mr. Senator Fuiíhan was a layman, and I think that each one of the other senators, whose opinions I have not now at this moment read, were also lawyer’s ; and I believe it is very unusual in-that court, as I suppose it is in this, that lay gentlemen read opinions upon questions of law that are argued before the court.
(Lord Blackburn.) I have not seen the case; I may look at it afterwards; but do I understand you rightly that the only question on which this was in the slightest degree relevant was whether the Dutch law was in force in the province at the time when this took place, so as to give rise to an equitable fraud by which they might set aside the statute of limitations ?
From a hasty reading of the case now, that is my impression, but ,1 should not like to say absolutely.
If the question was Dutch law and English law, how could it be in the slightest degree relevant or material to inquire whether the English law was further modified by another statute ?
The only effect it would have upon my mind, taking the whole of the discussion of the judges together and the history of the cause, would be to show the historical information that appeared to be possessed by this court in the State of New York at this time touching the social organism and the automatic political condition of society at that time as to the obtaining of its laws.
On cross-examination : The reasons [for believing the act of 1681 in force in 1772] that exist in my mind from the examination I have made, and from my previous general historical' knowledge of the state' of society, the population and the institutions, and the different nationalities that lived in the province of New York,- are, to state it in a word, aside from this, or in the absence of any evidence of repeal that I know of, the fact historically known to me (as we all know' history), that society could not get on in that province, composed of Englishmen, Dutchmen, and so on (civilized persons who required automatic laws), without some code of laws that should be in force all the time. The “Duke’s laws” of 1665 (whether passed by competent authority or not, is not a question for me) made a very complete and satisfactory code for the social economy of the people of the province. I am informed historically, and I believe that those Duke’s laws were copied in manuscript in many books, and sent as the body of the laws to the various headquarters of the settlements, by whatever name they went, which I do not know; and I have recently seen produced by *473 counsel on the other side, in the United States, as I came to take the steamer, one of those ancient copies. It was brought up from Hemp-stead, Long Island, and was a very ancient copy, worm-eaten, and evidently genuine in its authenticity as a book. I am not speaking now of its authenticity as a law. This is a code, compiled apparently and alphabetically arranged, which covers almost everything that the operations of a well-ordered young society would require, just as the statutes of Great Britain in early times did, and as those of the United States do now.
Alluding to that last reason of yours, you are acquainted with a collection of the laws of New York made in 1691 ?
No, not a collection made in 1691; a resolution or order was made in 1691 to collect the laws of New York that had been passed since the revolution of 1688. I am acquainted with the printing that took place after that time.
There was a printed volume ?
Yes.
If it was so essential to the condition of the then society to have the laws collected as you suggest, and have a regular body of law for the government of the country, can you account for the collection only commencing from 1691, supposing all the other laws were then in force ?
The only way I can account for it (and certainly it is not a very satisfactory way, to my own mind), aside from the enthusiasm of the moment in respect of the accession of William and Mary, is that it was a question of expense, and of the rapidity of the publication of new laws. The same thing has happened in early times in the State of Vermont, as I happen to know historically, that whereas the governing powers there had passed many laws for their local government, it would happen at a later stage in the very early history of the State, that the legislative authority would pass a resolution, or make an order requiring the printing of the laws passed in that session, and a standing order for printing all the recent public ones, without directing that all the laws should be got together and printed or reprinted.
You have reports of the decisions of the courts from about, the year 1775, I understand ?
About the period of the revolution.
In those reports, or in any other documents, can you find a trace of any marriage having been held invalid for want of the formality prescribed by the Duke’s laws of 1684 ?
I have no knowledge of any such case, and I do not think any such case exists.
*474 (The Lord Chancellor.) And with regard to laws on other subjects, is there any trace of any case determined upon any of those laws ?
I do not recall any at this moment, except so far as the cases have been referred to already by gentlemen on one side or the other.
(Lord Blackburn.') I suppose, also, you are not able to tell us whether there is an authentic register, and whether there are any entries showing that marriages are registered there, as they ought to be, if what has been called the act of 1684 was in force ?
Of course, I have no information on the subject, and no knowledge, and have not even any belief. I have no impression upon the subject at all.
Robert Ludlow Fowler, (of New York,)of counsel for Sir James Maitland.
I. The marriage law of New York in the year 1772 is determined by many historical legal considerations.
(a.) The first European occupation of the extensive territory subsequently embraced in the Duke of York’s patents of 1664 and 1674, was by and on the part of the Dutch.
The principles of the Roman law relative to derelict property acquired by occwpatio, determined the claims of the European powers in their partition of American territory. Sir II. Maine, c. viii. Ancient Law.; 2 Brodhead's IIist. N. Y. 10; Wheaton's Elements, c. iv. part II.; Woolsey Int. Law, § 55.
Discovery and settlement united alone in the Dutch, who first established civil and municipal governments in the territory adjacent to Hudson’s river. They introduced here the Roman Dutch law. Intd. to Col. Doc. 1, p. xxvi.; Laws and Ordinances of New Netherland, 400; O' Callaghan's Hist. of New Netherland, 90; 1 Brodhead’s 'Hist. 163; Moulton's History, part II. 369.
This Roman Dutch jurisprudence regulated marriage in this territory certainly until the year 1664, and to some extent subsequently, by well settled principles of public law.
(b.) In 1664 the territory was conquered by the English under instructions from King Charles II. and his agent, the Duke of York. Capitulation articles were signed on August 27 (Old Style), 1664. Appendix No. 1 to 2 N. Y. Laws, 1813; 2 Col. Doc. 250). These articles determine the status of conquest, as capitulation articles are the concomitantia of military commanders. 1 Wheaton's Elements, 473. A capitulation is not the precursor of a. peaceful settlement of an unoccupied territory, so as to bring New York within the definition *475 of a planted colony, acquired by discovery and settlement of res nullius.
(c.) The English, under authority from the crown, next established a civil government here (Patents to the Dulce of York of 1604, and 1 N. Y. Patents, 109-115; 2 Col. Doc. 295-8); and by contemporary authority this province was regarded as acquired by conquest (Holland Documents, X.), and under other political and historical authority. The civil government thus established was termed by contemporary English jurisprudents a proprietary government, in the nature of a feudatory principality (Pownall on the Colonies, pp. 55, 60; 4 Colee's List. 205), and the powers of the lord proprietor were derived solely from the patents. 1 Bla. Com. 109; Clark's Colonial Law, 21. The Duke’s laws (1664), including that on marriage, were by all the English authorities, down to the American Independence (id. sup.) valid and subsisting until duly repealed.
(d.) In tempore belli New York was again conquered by the Dutch in 1673, but subsequently ceded to England under the Treaty of Westminster, February 9, 1674. In the interval Dutch laws were re-established. 2 Brodhead's Hist. N. Y. c. v.; 2 Col. Doc. 609, 678, 683.
(e.) The status of New York thus became fixed as a ceded province. Indubitably therefore the laws of the conquered remained until superseded.
During the Dutch interregnum, the Dutch enforced their own law of marriage. Fiscal v. Fabricius, 2 Col. Doc. 691, 2, 3. On the recession to England, the rights of the former inhabitants acquired under English domination revived jure postliminii. Chitty Prerog. 38; Chalmer's Annals, 580; Sir James Marriott's Opinion; Chalmer's Col. Op. 633; 3 Col. Doc. 227; Recital in c. 293, N. Y. Laws of 1715.
(f.) To set the Duke of York’s title to his province of New York at rest, a second patent from Charles II. was duly issued to him in 1674. Leaming & Spicer's N. J. Laws, 41 et seq.; 2 Bla. Com. 347. He now possessed the same governmental powers as before, and had full right to commission a governor (3 Col. Doc. 215), and instruct him to put in execution the former English laws (lb. 218), as he did; which included the marriage law of 1664. lb. 226, 260.
In so far as this law repealed the laws of the Dutch, it regulated marriage in New York until the year 1684.. .
(g.) In 1681 steps were taken for the purpose of procuring a repre- j sentative government (Dawson, 18; Record of Court of Assizes for 1681; Wood’s L. J. 100), which was conceded by the lord proprietor. 3 Col. Doc. 317, 328, 331.
The laws thus enacted were to be good and binding until confirmed or consented to by the Duke. This period of time is called probation- *476 ary in old colonial law. See Clarendon Papers N. Y. Hist. So. Col. for 1869, p. 118, and change in the former law, 3 Col. Doc. 831.
A first assembly mot in New York city in 1683, and at its second session passed the “ Marriage Law of 1684.” It was confirmed. 3 Col. Doc. 370.
(h.) King Charles II. died February 6, 1685, and the Duke of York became James II., and his private estate in New York merged in the crown. 3 Col. Doc. 359; 8 Coke's Lit. 156, note 4; 1 Skinner (King's Bench) 603; Plowden's Com. 212.
(i.) The province was now and henceforth, by the public division of the common law, a provincial establishment, the constitution of which depended on the governor’s commission and instructions. Chitty Prerog. 30; Stokes' Colonies, 14, 16; 1 Bla. Com. 108; 1 Doug. Sum. of Brit. Settlements, 216, 382; 2 Id. 251. The right of the crown was not doubted by contemporaries (1 Stokes, 28), for the government was not a chartered government. Chitty's Prerog. 33; 4 Col. Doc. 1154, 1155. These various commissions and instructions continued all the former colonial laws until the English revolution of 1688.
(j.) Then, by the act of settlement, crown provinces (including New York) pursued the line of devolution prescribed for the crown. Chitty's Prerog.; 1 Doug. Sum. of Brit. Settlements, 382 ; 1 Doc. IIist. N. Y. 377.
The effect, like a demise of the crown (3 Hallam's Const. IIist. 95; 2 J. Macauley's Hist, of N. Y. 479, 507; 3 Id. 26), was never pretended to repeal former laws.
(k.) In 1691, for political purposes, the lower house of assembly adopted a resolution, declaring all laws consented to under the Stuarts, “invalid on account of their not being observed, ratified, and approved,” etc., etc.
This resolution, historically inaccurate in its statement of fact, was, never concurred in by the council, nor by the governor; wherefore it was inoperative as a repeal. 4 Coke's Inst. 25; Plowden's Com. 79; Humbert v. Trinity Church, 24 Wend. 587, 625.
The case of Van Winkle v. Constantine (10 N. Y. 422), declares only that this “resolution was not intended as a repeal,” and People v. Trinity Church (22 N. Y. 44, 52), that it was ineffectual as a repeal.
But the question of the legal effect as a repeal, for all the purposes of this case in 1772, is determined by the public law of the late colony, and not by the ex post facto adjudications of the State courts. Contemporary and accurate historical authority shows that this resolution was always regarded as nugatory. See Cosby V. Van Dam, N. Y. *477 Supm. Ct. 1732-3; Chalmer's Annals (Lond. ed. 1780), 585; 1 Hoffman's Ch. Pr. 15; Butler's Const. History N. Y. 41.
The administration of the province of New York was dictated in England, and there is no proof that the law .officers of the crown ever repudiated the statutes passed under the Duke of York, or by the legislature of 1683-4, but there is proof to the contrary.
(1.) Therefore, the: marriage law of 1684 was continued in force as much as if in viridi observantia. There is no such thing as a repeal by non-user in the law of New York.
If it and the Duke’s laws were not in force, there was no authority for the practice of marriage licenses, or for the publication of banns, which practice was universal down to the abolition of the prerogative office by a statute of the revolutionary government, which went into effect in the city of New York only on the evacuation by the British in 1683.
(m.) The canon law was never in force in New York; hence the ecclesiastical jurisdiction was in the crown, and by the crown was delegated to the governor pro tempore. The governor held the prerogative seat as part of the prerogative. But the exercise of the prerogative in respect of marriage in New York was permitted only by the local acts indicated.
(n.) Recourse to adjudications of the State courts subsequent to the revolutions as a means of determining what was the law in 1772, is agreed by all the American counsel of Sir James Maitland to be argumentative only, and not controlling, because if the matter affects property of English subjects, under the treaty with England the supreme court of the United States is the appellate tribunal, and it has not passed on the question. We must presume, therefore, that its decision would be postulated of the premises already stated.
(o.) The later doctrine of the courts of the State of New York, to the effect that a marriage per verba de presentí is valid, only pertains to New York marriages since .the year 1776, and they do not pretend to decide otherwise. So far as they profess to interpret the common law of England, these State cases disagree with the final result in England (The Queen v. Millis, 10 Cl. & F. 534), and in no instance do they pass on the institutions and law of marriage in the province of New York in the year 1772. To reason'backwards from such decisions is therefore an illogical process, and the law of 1772 can only be determined by an examination of the constitution and statutes of the province. Such an examination shows that the law of marriage in New York in 1772 depended on the statutes of 1664 and 1684. These being British statutes, their legal effect is for British judicatories in a British i ase.
*478 (p.) The common law of New York prior to independence was peculiarly complex, owing to the fact that the province was acquired by conquest, and by reason of this mode of acquisition, considerable portions of Dutch law and Dutch institutions remained unrepealed, and were inseparably blended with the laws of the English conqueror. In spite of dicta to the contrary, the Roman Dutch law has been recognized by New York courts to such an extent as to shift the burden of proof on those who contend that the English common law regulated all the acts of colonial life. Ogilby's America; Chitty Prerog. c. 3, p. 29; Edmund Burke's History of America, 185; Cosby v. Van Dam, N. Y. Supreme Court, 1732 ; Denton v. Jackson, 2 Johns. Ch 320; Dunham v. Williams, 37 N. Y. 251; Bartow v. Draper, 5 Duer, 130, 140; 1 Hoffman Corp. 199; Story v. N. Y. Elevated R. R. Co., 3 Abb. N. C. 478, 489; Van Giesen v. Bridgford, 18 Hun, 78.
On this ground also, it may well be affirmed that the law of marriage in New York in 1772 was not regulated by any system of unwritten law, but by positive enactment of the conqueror, and owing to" abundant proofs of observance that such statutes were in riridi obsercantia in the year 1772.
(q.) As to the legal effect of omission of banns or license upon a marriage before a priest of the Onurch of England in New York in 1772, I am not called upon to express an opinion; it is determined by the language and construction of the acts of 1064 and 1084, or by the later act, if it repeal the former by implication. Both these acts, being acts passed under authority of the English crown, can be interpreted in this case only by the court, in my judgment. But, as stated, they were not repealed, and presumably composed the marriage law of New York in 1772, and until repealed.
Sidney Webster, of New York, of counsel to Sir James Maitland.
Question 1. Was the law of marriage in New York, in 1772, contained in Dongan’s law of 1684, supplemented, where defective, by the older law of the Duke of York and of the Dutch ?
From 1609 to 1772, there was no opening through which common law as to marriage could become established in New York. Down to 1661, the law of the region had been continuously Dutch. In my opinion, the laws of marriage down to that time, de jure as well as de facto, were Dutch. No view of the coast had, or entry of the harbor made, by men of other nationality could establish the law. Taking possession and settlement is necessary (Wolff, Institutions du Droit de la Nature et desGens, § 213 [ed. 1749 ]; Vattel, Droit des Gens, § 208 [ed. 1758]; Martens, Préeis du Droit des Gens, § 37 [ed. 1789]; Kluber, Droit des Gens, § 126 [ed. 1819]; 2 American State Papers, Foreign Relations, *479 663 ; 4 Id. 407, &c.) The incidents of history,—the Cruise of Dermierin 1618 following Block, a Dutchman, who had been there five years before ; Sir Walter Raleigh’s landing in North Carolina, 1584; expedition of Grosnold, 1602, 1606 ; the charter granted by James I. to the London and Plymouth companies, 1606 ; founding of Jamestown, 1607, and Plymouth, 1620; the seizure of the Dutch vessel carrying the governor and director general of the New Netherlands, and the consequent diplomatic correspondence, 1631 ; the repulse from the harbor of New York by the Dutch, of the first English vessel which entered there, 1633,—show that any asserted English title to Manhattan was unfounded for want of occupation and possession. In July, 1648, Peter Stuyvesant, as director general, &c., in co-operation with the council, was vested with the administration of law civil and criminal, and in 1650 he established the boundary between New Netherlands and Connecticut. From that date till 1664, the Dutch sway over Manhattan Island, the greater portion of the region on the navigable part of the Hudson and the greater part of the province, was unresisted and complete. The transaction which resulted, in 1664, in unfurling for the first time the English flag over Fort Amsterdam, "nd exchanging the name of New Netherlands for New York, was an act of war and military conquest by a superior force. An English fleet, oo-operatod with by militia from Connecticut, commanded the city as well as the Hudson River, and terms of surrender were stipulated, reserving to the Dutch their own customs concerning “ their inheritances,” and stipulating that “ all differences of eontraets and bargains, made before this day, by any in this, country, shall be determined according to the manner of the Dutch.”. This conquest was subsequently confirmed by treaty between England and Holland, July 1667, but was termed a conquest by Lord Mansfield, inCampbcdl v. Hall, 20 State Trials, 239.
Question II. Howmuck of the Dutch law remained after this conquest ?
Under the doctrine of Campbell v. Hall, above stated, and the subsequent Case of Picton, 30 State Trials 225; and Dana's Notes to Wheaton's Elem. of International Law, note 169, p. 454 [ed. I860], and jurists cited ; U. S. v. Percheman, 7 Peters, 51, 86; Mitchel v. U. S., 9 Id. 711, 734; Strother v. Lucas, 12 Id. 410, 435 ; Leitensdorfer v. Webb, 20 How. (U. S.) 176; Am. Ins. Co. v. Canter, 1 Peters, 511; Chicago Railway Co. v. McGlinn, 114 U. S. 542, it cannot be doubted that the Dutch ordinances relating to marriage (4 N. Y. Collection of Colonial MSS. 456; 5 Id. 197; 16 Id. 40, 19; 8 Id. 647) were in force in the colony until repealed or modified by the conqueror. The justices, with the governor and council holding the court of assizes, approved a Code prepared by Nicolls, after examination of the New *480 England laws, which Code is known as the Duke’s laws. [Counsel here quoted the provision therein relating to marriage, which will be found at p. 443 (above).]
Those provisions were modified from time to time, notably in 1655, 1656, 1657. In 1672 a secret treaty, the full text of which has only i come to light in the present age, was concluded between the kings of France and England, contemplating a war against the Dutch, and in ,1673 the Dutch squadron demanded and received the surrender of the city. This re-conquest and the subsequent treaty of Westminster in 1674, led to serious legal complications and consequences in respect to the patent issued by Charles II. to the Duke of York in 1664. England had negotiated by the treaties of Breda and Westminster with the States General as a sovereign, and as the possessor of the Province of New Netherland. The patent of 1664 to the Duke of York had been sealed many days before the naval expedition against New Netherlands had been ordered, and had sailed from England, and while the Dutch were in the quiet possession of that province. No new grant had been, made to the Duke of York after the treaty of Breda, which confirmed to the English king his conquest of the Dutch province.
The Duke of York and Andros, as his colonial lieutenant and deputy, confirmed the previous laws, including the statutes in respect to marriage.
, The second session of the first assembly of the colony of New York under Governor Dongan began in October, 1684, and among the laws passed by the assembly was one entitled the “Bill Concerning Marriages ” which was in the words following ; [Counsel here quoted the act of 1684, which will be found at p. 444 (above). Other provisions not material are here omitted.] This law was assented to by Governor Dongan, and confirmed by the Duke ; and it precluded the English common law or any other on that subject down to the death of Charles II. James II., by new commission to Dongan, repealed the charter, declaring, however, that all other laws, statutes or ordinances should continue in force so far as not inconsistent with his instructions.
The first assembly under William and Mary was convened at the city- of New York on April 9-, 1691, and fifteen days thereafter, as appears by the journal of that assembly, the lower branch thereof passed a resolution in respect to the repeal of all laws consented to by the general assembly under the Duke of York, and also the several ordinances made by the late governors and councils.
There was no legislative enactment or order of the colonial governor and council, or royal order of the king, or legislative enactment-by the British parliament, expressly-relating to marriages in the colony of New York, that has come under my observation, subsequent to the *481 marriage laW of the colony of 1684 heretofore referred to, nor have I been able to find any marriage law of the colony down to the year 1772 which repealed or modified that legislation of 1684.
I have not been unmindful of a series of American judicial decisions by the federal courts of the United States, and by the courts of the state of New York, which have more or less bearing upon the questions presented, and especially the opinion of the supreme court of the United States in the cases of Johnson v. McIntosh, S Wheat. 543; and Martin v. Waddell, 16 Peters, 367; and the cases in the courts of New York entitled Canal Commissioners v. People, 5 Wend. 424; Bogardus v. Trinity Church, 4 Paige, 178; Humbert v. Trinity Church, 24 Wend. 587.
I am aware that an inference has here and there been drawn, chiefly by historians, from the remark, in Jackson v. Gilchrist, 15 Johns. 89, in respect to the charter of 1683, that all the statutes, laws and ordinances of the colony of New York enacted or declared under English authority subsequently to 1664 fell in consequence of the revolution of 1688. The first suggestion of such an inference was made, I think, by Smith, in a note to his “History of the Province of New York,” is .which he says :
“ All laws made here antecedent to this period (1691) are disregarded both by the legislatures and the courts of law. In the collection of our act's published in 1752, the compilers were directed to begin at this assembly. The validity of the old grants of the powers of government in several American colonies is very much doubted in this-province.” See American edition of Smith’s History ; Philadelphia, April 2,4792, p. '87.
I am quite unable to perceive how or Why the abdication of James II. and the coronation of William and Mary should have produced such a tremendous legal consequence in the colony of New York. Certainly the new king by a royal "order continued in power the Colonial officers-then exercising authority in the province until his further intention? should be manifested, and it would be quite absurd, it seems to me, ter assume that those officers were continued in power with no statutes or ordinances to prescribe the rights to be held, and the duties to be pen-formed in the colony of New York by such officers. That the remark of the judge giving the opinion of the court in Jackson v. Gilchrist; (supra) was not law at the time, and is not accepted as law in NeW York, may be inferred from the opinion of Judge Turman, expressed in the case of Humbert v. Trinity Church, 24 Wend. 587, sitting in the court of errors, Which was a tribunal of final appeal and jurisdiction.
In 1853, and in the case of Van Winkle v. Constantine (10 N. Y. 422, 424), the court of appeals, a tribunal of final jurisdiction, said that the resolution of the colonial assembly of 1691 “ was not intended as *482 repeal, but as a statement of the fact that they had been disallowed or discontinued by the late Duke of York, and was, 'therefore not binding upon the people of the colony..
The first branch of the resolution, only attempts and purports to' declare null and void such laws as have been (1) consented to by the general assembly under James, Duke of York, and (3) “not ratified and approved by his Royal Highness, nor the late king." , But I have not been able to discover any evidence, and I believe there, is no evidence, that, the “bill concerning marriages” was either vetoed, or was “not ratified and approved by his Royal Highness and the late king,” and so for that reason the resolution of 1691, did not touch that marriage law. The second branch of the resolution of. 1691 only refers to and declares null and void “ the several ordinances made by the late governors and councils being contrary to the constitution of England and the practice of the government of their Majesty’s other plantations in America.” The “ bill concerning marriages” was not an ordinance made by the late governors and councils,- but was a legal statute enactment. , It was not unconstitutional, nor in violation of colonial usage, and, for this second reason, therefore, this marriage law was not touched by the resolution of 1691.
Moreover, under the rule and practice of legislation in the colony (3 Colonial IIist, of N. Y., London Documents, 1768-1782), the resolution must be deemed nothing more than a declaration or wish of one branch not concurred in by the other or by the governor, and could have no effect as a repealing enactment.
“ The fundamental law ” of the colony of New York in 1772 and in 1774 was.made up of : (l).So much of the Dutch law as was unrepealed and continued in force; (2) so much of the English common law as had been established after the conquest in 1664; (3) so much of the English parliamentary statutes as had been enacted and specially made applicable ; and (4) the colonial statutes legally enacted and sanctioned by the Crown. A great deal of the confusion of thought and inexactness of expression in dealing with the early colonial law of New York may have grown out of a failure to adequately discriminate between planted colonies and conquered colonies, and a failure to appreciate the fact that during half a century the province of New York was governed and controlled by Holland, which had a common law of its own as distinct and well recognized as was the common law of England.
That there was a common law which may be generally described as “ English common law ” prevailing on certain subjects, and regulating certain transactions in the colony of New York in 1772, cannot be denied. Nor, on the other hand, can it be denied that, in certain other matters, there was another and a different law. • The English *483 common law has not prevailed, and docs not prevail everywhere in the United States, as is seen in the case of Louisiana, which, having been acquired by treaty from France, presents some analogies to the circumstances of the acquirement by England of the colony of New York from Holland. That some portion of the English common law did exist in the Colony of New York is recognized in the first constitution of the State after it became independent, which declares, in effect, that sv.ch portion of that common law as was in use in the colony at the date of- the battle of Lexington, April 19, 1775, should be the law of the State, unless modified by some statute or constitutional provision. But that clause in the State constitution will afford little aid in ascertaining whether, in 1772, the institution of marriage was or was not regulated by a specific statute applicable thereto. That some portion of the Dutch common law was in force in New York at the time of the adoption of the constitution, is to be inferred from the case of Dunham v. Williams (37 N. Y. 251), in which the court of appeals in 1867 decided in effect that the title to a certain roadway was governed not by the English common law, but by the Dutch common law. The colonial marriage law of 1684 was a valid enactment at the date of its enactment, in so far as it covered matters, and also punishments, embraced in any previous statute, or ruled by the common law, and was inconsistent therewith, so far as it repealed or abrogated both by implication. Any contract of marriage, or any other contract, in palpable violation of its requirements, would be void so.long as the law was in force. The same was true of the Duke’s laws of 1604 concerning marriage, and their amendments, and if it could bo found that the marriage law of 1684 was repealed prior to 1828, then, in the absence of any positive law to the contrary, the Duke’s laws would by implication be revived.
Question III. Did a non-observance of the requirements of Dongan’s act, 1684, render the marriage null ?
Lord IIxrdwicke’s marriage act of 26 Geo. II. (1753), declared all marriages void in other than a sanctioned place, unless after publication of banns or special license. The modern rule distinguishing between words of nullity and words of penalty (Meister v. Moore, 96 U. S. 76; Jewell v. Jewell, 1 How. [U. S.] 219), was not in force in 1772. Fenton v. Reed (4 Johns. 51), is opposed by Milford v. Worcester (7 Mass. 48), and the decision in Jewell v. Jewell (above), led to a modification in Kent's Oomm. in the 4th edition, vol. 2, p. 82, by the insertion of the words, “ in the absence of all civil regulations to the contrary.” The Dongan law must be construed as equivalent to declaring marr age in disregard of it void.
*484 Question IV. In what way can a marriage in the colony in 1772-bo proved ? • . ,, ... ....
My opinion is that the fact of marriage, could not be proved either by facts of consent between the parties and copulation, or of habit and repute, occurring alone or in conjunction, and for the reason, among other reasons, that mere consent did not, in the colony of New York, constitute a marriage in 1772, but a consent and an application thereto by the State of specified ecclesiastical or judicial acts. No possible-acts of the parties, prior or subsequent to the mutual consent, could, in the absence of the prescribed ecclesiastical or judicial acts, create a marriage. Moreover, Dr. Ogilvie does not' certify that he joined the two in matrimony in compliance with the provisions and requisites of I ho Dongan .act, or of a colonial law, but “ according to the rites and ceremonies of the Church of England, as by law established.” Such a declaration is deemed to be irrelevant, except so far as it relates to the matter which the declarant stated in the ordinary course of his business or duty. Chambers v. Bernesconi, 1 C. M. & R. 347; R. v. Clap-ham, 4 C. & P. 29.'
I am not aware of any decision of any court that can make the statement of Dr. Ogilvie that he married the parties “ according to the rites and ceremonies of the Church'of England, as by law established,” relevant to the issue whether or hot the parties were married according to the requirements and "provisions of the law of 1684 in respect to banns or license. The difficulty with the certificate of Dr. Ogilvie is that it does not touch arid cover or lead up to the fact in issue. In American courts it would not he admissible in evidence to prove a compliance with the colonial law in existence in 1772.

*485

*486

*487

*488

*489

*490

*491 Note on the Sources of American Colonial Law.
The apparent conflict in the law of colonial New York regarding marriage, was occasioned largely by the complex political history of New York. From its first settlement by the Dutch to the year 1664, Now York was, practically at least, a Dutch province, administering the Boman Dutch law. See Daly's Judic. Organization of the State, Pref. to 1 E. D. Smith's Rep., and Van Giesen v. Bridgford, 18 Hun, 73. It became subject to the English crown in 1064, but the English had long prior to this made claims as owners of the territory, by the contemporaneous law of nations, so that this armed occupation in 1661 did not determine for judicial purposes the original political status of the province. Hence, there have arisen two opinions ; the one claiming that England acquired New York by conquest (Penn v. Lord Baltimore, 1 Ves. Sr. 444, 452; Campbell v. Ilall, 20 St. Tr. 239 ; S. C., Cowp. 204,211; Constantine v. Van Winkle, 6 Hill, 177, 181; Van Giesen v. Bridgford, 18 Hun, 73, aff'd in 1 Tucker's Bla. Com. 382), the other school contending that it was acquired by discovery. Bogardus v. Trinity Church, 4 Pai. 178; Canal Appraisers v. People, 17 Wend. 570; Morgan v. King, 35 N. Y. 454, rev’g 30 Barb. 14; 83 N. Y. 348; Canal Commissioners v. People, 5 Wend. 424.
Certainly the claim of title by discovery has found earnest supporters in the briefs of the American counsel in the Lauderdale Peerage Claim, and it is a subject of regret that the House of Lords did not fully meet this question in that case.
The reason for this strenuous divergence of opinion is to be found In the diverse corolarios of jurisprudence. Iu case New York was acquired by England by conquest from the Dutch, then the former Dutch law remained in force until abrogated by the conqueror. Rex e. Vaughan, 4 Burr. 2494, 2500; Livingston’s Intrd. Penal Code, Louisiana, 59; part. II. ch. iv. Wheaton's Elements Int. Law; 1 Story on Const, ch. 16. But in case New York was acquired by Englishmen by discovery, the judicial presumption would be that the English common law regulated the affairs of life in the absence of local statutes. Canal Appraisers v. People, 17 Wend. 570; Jackson v. Gilchrist, 15 Johns. 89, 110; 1 Story's Const, ch. 16; Chitty's Prerogatives of the Crown, ch. III.
The difficulty with these rigid theories is that while suited to tho jurisprudence of European countries, they have less practical application to the sparsely settled colonies of the New World. When the few foreign inhabitants died out of a conquered plantation, the inconvenience of a rigid application of the doctrines denoted, became almost *492 unjust in- some cases; and this was intimated in Campbell v. Hall (20 St. Tr. 239; S. C., Cowp. 211, 213), and Phillips v. Eyre (L. R. 6 Q. B. 1).
But in New York the ancient- Dutch inhabitants remained -in considerable numbers all through the colonial epoch, and it has been thought that the facts suggested in Campbell a. Hall (supra), did not. sufficiently coexist in New York to make- it an' exception to the rigid rules of European jurisprudence; and such was evidently the-view .in ’ Dunham v. Williams, 37 N. Y. 251.
It w-iil he seen, therefore, that the - first inquiry in determining & point of the law of colonial New York is,' was it regulated in the absence of statute by the Roman Dutch common law, or by the English common law ? ■'
If the point, is regulated by statute of the province, a second inquiry has regard to the date of the enactment. After the Dutch authority succumbed to the English, the Duke of York (afterwards James II.), became Lord Proprietor of New York. Under him certain" enactments of-a statutory nature, notably the “ Duke’s laws,” as they were called, were obeyed beyond question up to and until the English revolution of "1688. The validity of all the laws of the Duke of York as Lord Proprietor, and even as King, were then questioned by a singular resolution of a single house of the New York assembly, which is apparent in its journal of April 24, 1691. Journ. N. Y. Assembly.
This resolution has given rise to a- series of" conflicting adjudications, and has left it an open question for constitutional lawyers, as to how far this resolution was operative as a. repeal. It will be perceived that the opinions of American counsel in this case deal largely with this point. The House of Lords did not pass on that point of their colonial law, but Lord Selborne alluded to it, and.Lord Blackburn and -Lord Watson considered it, while Lord Eitzgerald placed his opinion upon the mere question of presumptive proof, and disregarded it.
• It.will he scon that Lord Blackburn introduced anew element of inquiry in-colonial.law of New York, by suggesting that the laws, or some-.of them, passed under the authority of the Duke of Yorkj may have" been void, as ultra, vires of" his delegated regalities. But the other.Lords- did. not-concur in any such suggestion, and in this suggestion he stands alone, the point not having been discussed. The want of "power in the Duke of York, if insisted upon in any future case, would'present a very nice point in regard to the constitutional prerogatives- of the crown over the crown colonies in the 17th century. These prerogatives were largest under the Tudors .and the Stuarts, and ■ gradually diminished until they have assumed their modern form. *493 Suppose a colonial statute, acquiesced in for several hundred years, but which has grown, as it were, unconstitutional by modern development, how should a point of law turning upon a- period when that statute was in viridi observantia, be now decided 1 Certainly if locus regit actum is sound, tempus regit legem should be none the less sound in colonial law.
Many laws of New York were passed by the Stuart dynasty. As Dicey has said, “ The struggles of the seventeenth century, the conflict between James and Coke, Bacon’s theory of the prerogative, Charles’s eSorts to substitute the personal will of Charles Stuart for the legal will of the King of England, are all matters which touch not remotely upon the problem of actual law.” Dicey's Law of the Const. 17, 59. It was before this conflict was determined, that Charles II. granted the province of New York to his brother, the Duke of York. There is great force in the suggestion that the powers of the Lord Proprietor for the purposes of New York were determined by his patent, and not by the modified constitutional doctrines of this century, as suggested by Lord Blackburn’s dictum. , But even if they were so determined for purposes of the English sovereignty, it is questionable whether by our constitutional limitation all questions of prerogative of the crown are not to bo determined by the common law anterior to April 19, 1775. Art. I. sec. 17, Const. 1846.
The only element in the question which remains inadequately noticed in the foregoing discussion is the relative population of English and Dutch in the colonial settlement. The great preponderance in numbers of the Dutch, at the time the English took possession in 1664,* is certainly a circumstance not to be overlooked in weighing the claim that Dutch law continued so far as not expressly superseded. But the complete inversion of this relation Which the lapse of a century wrought, soon resulting in a decided preponderance and at last an overwhelming *494 -merger of Dutch individuals in an English community* is equally significant in enabling us to appreciate the process of the introduction of English law if it was but a gradual process. The maxim of public law "that a conquered people retain their private law is undoubtedly illustrated by the Dutch in the incidents of 1064. But the maxim that "colonists settling in a new country carry their own private law with - them is equally-clearly illustrated by the English toward the other end of the period. The confusion of opinion is involved Whenever it is attempted to determine whether a subject- at any given date is controlled by the vanishing Dutch law or the rising English compaon law.
Note on Mode "or Proving Marriage. ■ -
I. Direct proof of the contract of marriage may be made or aided by
(1) ' Statutory registry.
(2) Ecclesiastical registry. ;
(3) Certificates of marriage. '
(4) Admissions by parties.
(5) Eye-witnesses.’
■ (6) Presumption of regularity.
(7) Disregard of irregularity.
(1) Statutory registry.1 In nearly all the States the record of a marriage made and kept as prescribed in the statute, or a duly certified copy of such record, is made presumptive evidence of such marriage. See Stimson's American Statute Zaw, § 6144; Verholf v. Van Houwenlengen, 21 Iowa, 429 ; State v. Hasty, 42 Me. 287.
But such a statute does not by implication make the register the necessary primary evidence.
The entries in such registers are admissible at common law, without any special statutory provision. Maxwell v. Chapman, 8 Barb. 579; Jackson v. King, 5 Cow. 237; Weaver v. Leiman, 52 Md. 708.
Contra held of a copy of a foreign register. State v. Dooris (below).
(See, as to what kind of registers and books are thus admissible, 2 Phil. Evid. 112,,114.) •
But it is a general rule, that such registers are admissible only where it is the duty or usage to keep them, not where the keeping was merely optional. Bradford v. Bradford, 51 2T. Y. 669.
In such case, however, the entry may" be evidence, just as an *495 unofficial paper might be if part of the ,ro gestm, when there is other direct proof of the fact of marriage, or may be competent as a memorandum in aid of the testimony of a person concerned in it.
. Upon these principles it was, finally held that the Fleet registers were not, as such, evidence of marriage because illegally made. Read v. Passer, 1 Exp. 213; Doe v. Gatacre, 8 Carr. & P. 578; and dictum in Lloyd v. Passingham, 16 Ves. 59, overruling Doe v. Madox, 1 Esp. 197. But it was still conceded that theymight be competent as a declaration under the hand of a party. Lloyd v. Passingham (above).
— copies,\ A transcript of the record or registry, of a marriage in a foreign country, however well authenticated the same may otherwise be, is not "competent prima faeie evidence of the marriage therein declared and recorded, without proof of the laws of such foreign country requiring that such record or registry be made and kept. The case was a prosecution for bigamy! The document was admitted against the defendant’s objection on the ground that it was not accompanied by proof of the foreign law. Meld, error. The value of such a record is that it is made by a person whose duty it is by law to keep it. This must be made to appear. Stanglein v. State, 17 Ohio St. 453.
In a petition for divorce the question was whether the evidence adduced in support of the marriage was sufficient. In proof of the marriage, a certified extract from the Marriage Register, proved to be kept in Chili, in compliance with "the requirements of the laws of Chili, and to be admissible in evidence in Chili was offered. Evidence of the identity of the parties and the curate was produced. Meld, to be sufficient. Divorce decreed. Sole point. Abbott v. Abbott, 4 Swabey & Trist. 254.
Examined copy of register of marriage in Swedish ambassador’s chapel at Paris, was held admissible to prove marriage (in an action for goods sold). Leader v. Barry, 1 Esp. 353.
Since by canon law clergy are required to form and sign the register’s weekly, and annually to transmit a duplicate to the ordinary, these duplicates are evidence. Dictum. Lloyd v. Passingham, 16 Ves. 59.
For the purpose of proving the first marriage in a prosecution for bigamy, the State offered in evidence a document purporting to be a copy of an entry in the “ Marriage Register Book ” in the office of the superintendent registrar of births, marriages and deaths for the district of M. in Ireland, the entry containing the signatures of the officiating priest, the parties, and two witnesses, and' the copy being certified as such by T. W. in his official capacity as superintendent registrar for the district of M. Meld, that the document was inadmissible, because (1) it did not appear that the keeping of such a book was required by *496 law; nor (2) that T. W. Was the registrar ; nor (8) that his signature Was genuine. New trial. ' State v. Dooris, 40 Conn. 145.
In an action for divorce a collated copy of an entry in the marriage register at Barbadoes was admitted as evidence of the fact of marriage. Cood v. Cood, 1 Curt. 755.
‘ See What was'held a sufficient “ copy of the town clerk’s record of the marriage ” under the statute. State v. Potter, 52 Vt. 33; IIuse v. Preston, 51 Vt. 245.
— identity.] The1 production of á statutory register tif marriage does' not dispense With proof of the identity of the person named. Wedgwood’s Case, 8 'Greenl. 57. ’ "
■Identity of name has however been held in many cases prima facie "evidence of identity of person, Jackson v. King, 5 Cow. 237; Jennings v. Newman, 52 IIow. Pr. 282.
Where, on a question of pedigree, a marriage in fact is shown at so distant a period as to render proof of the identity next to impossible, it may be presumed. In a contest over a residuary legacy which had lapsed, the distance in point of time' of the marriage in question was 200 years. There was some slight evidence of the identity ; and the prerogative court concluded that the fact of marriage had been satisfactorily shown, and decided for the heir as against the crown. Maule v. Mounsey, 1 Rob. Ec. 40.
Omission to name party.] Plaintiff claimed that she acquired a settlement in the defendant town by marriage with one James Priest, Jr., in 1705, to prove which they 'gave in evidence a certified copy from the records of the defendant town, in these words: *1 James Priest, Jr., married, October 1, 1795, by James Smith, Justice.’’ .Held (on appeal from an order of removal of a pauper), that this certificate was admissible to prove the marriage of -J. P. to some one; and it being shown that the pauper commenced to cohabit with, him about this time, and that he never cohabited with any other' woman, it was sufficient evidence to warrant the jury in finding the fact of marriage. Judgment for the plaintiff affirmed. Northfield v. Plymouth, 20 Vt. 582.
— authority of person solemnizing.] Under a statute (sections 2517 and 2528) providing for issuing a license ; its return; that the clerk of the county court shall keep a register containing the names of the parties, the date oi the marriage, and the' name of the person by whom the marriage was solemnized; ’which is receivable in all courts and places as evidence of the marriage and the date thereof,—Held (in crim. con.) ■ that such register is sufficient to establish a marriage without other evidence showing that the person Who officiated was authorized to ‘ soletimize marriage. Judgment for plaintiff affirmed. Verholf v. Van Houwenlengen, 21 Iowa, 429.
*497 (2.) Ecclesiastical registry.] Where there has been no official registry of marriages kept in the church'where a clergyman ministered, a private memorandum, in which the minister, in the ordinary course of his business, has entered, or intended to enter, as it occurred, each marriage celebrated by him, is admissible on a question whether such minister ever did or did not celebrate the particular marriage in question. The action was ejectment by plaintiff, whoso legitimacy was disputed. Defendant offered in evidence the deposition of the celebrating clergyman to prove the. absence of such a marriage in his registry. Held, that although the memorandum itself or a sworn copy should have been offered; yet the objection not having been raised before trial, the court below should have admitted the deposition. Judgment for plaintiff reversed. Blackburn v. Crawfords, 3 Wall. 191.
In support of a plea of coverture in assumpsit, it was shown that at the ceremony the clergyman gave the parties a certificate, and also made an entry of it in a register book which he kept. Held, that the certificate was receivable in evidence, as being a part of the transaction ; but that the register book was not admissible. Verdict for defendant on his plea. (The marriage was in Ireland, solemnized before a clergyman of the Church of England in private, and as the act of Parliament relating to marriage was not at this time in force in Ireland, the mai> riago was valid as at common law.) Stockbridge v. Quicke, 3 Car. & K. 305.
At the trial of an action of ejectment, the plaintiff (whose legitimacy was disputed), in order to prove the marriage of his parents, offered i i evidence a baptismal register of a church, in which entries of baptism are made in the ordinary course of the clergyman’s business, to the effect that the child was baptized as the “ lawfal child of,” &c. Admitted. Held, to be error. Such an entry is only admissible for the purpose of proving the fact and date of baptism, not to prove the fact of a marriage, by inference from the word “ lawful.” Blackburn v. Crawfords, 3 Wall. 175.
Examined copy of parish register of marriages, with. testimony of person examining the copy and original, that the signatures to the originals are in- handwriting of the alleged husband and wife, is proof of marriage and identification of parties. (Grim, con.) Bain v. Mason, 1 Car. & Payne, 202.
(3) Certificates and licenses.] Marriage certificates, if proved to have been kept in the custody of the person whom they affect or produced from proper custody, are admissible as collateral proof. Gaines v. Green Pond Iron Mining Co., 32 A. J. Eg. 86. But it is insufficient in a civil action for crim. con: Dann v. Kingdom, 1 Supm. Ct. (T. & C.) 492, and held properly excluded. But where it appeared *498 that the marriage certificate was given twelve years after the alleged s marriage was celebrated, held not admissible. Gaines v. Keif, 12 How. , 472.
It was recently held in Camden v. Belgrade (Me, April, 1880), 3 Ail. . Reporter, 652, that “ such a certificate kept and produced by one of the . parties as evidence of the marriage is admissible without separate and . distinct evidence of its genuineness, or that it was given by one acting . in. an official capacity.” Such proof may enhance its weight but will j not affect its admissibility.
In the trial of the defendant for adultery a paper purporting to be a f,, certificate of a marriage solemnized in another State, by a clergyman ... resident there, but not authenticated in any manner, is.not admissible, to prove the fact of marriage, “as circumstantial or presumptive evi- !¡ dence, from which the fact may be inferred,” though such paper be derived from the possession of the wife of the defendant. Verdict set aside and new trial granted, because this certificate was admitted. Commonwealth v. Morris, 1 Cush. 391 (1848).
, ; At the trial of an action of ejectment the defendant’s title as heir-at- , law depended on proof of his legitimacy. He produced a certificate in , the following form: “ I do hereby certify that I have this day married B. to 0. D., according to the Church of England,” dated and signed. * This was supported by proof of cohabitation and reputation. . There was no proof of publication of banns. Held, sufficient to establish the , marriage against the evidence of cohabitation and reputation of marriage with another person, alive at the time of the second marriage. The .jury having found for the plaintiff on the court’s allowing the question . of marriage to go to them, a new trial was for this reason granted. ' Wheeler v. McWilliams, 2 U. C. Q. B. 77.
To support a plea of a coverture in an action for goods sold, defendant swore that on a certain day she was married to one J. L., at a Cath_o!ic Chapel in London (both parties being Catholics), that the ceremony .was performed by a priest in the usual way in which Catholic marriages are solemnized, and that she cohabited with J. L. until he went to Australia. She also produced a certificate of marriage from the priest. .Held, that the.court and jury might presume that the marriage was .valid, though it was not proved that the chapel was licensed as required by-law, or that the registrar was present; since there is a.penalty for solemnizing a marriage in an unlicensed chapel, or in the. absence of (the registrar. Rule for pew trial discharged. Sichel v. Lambert, 15 C. B. N. S. 781 (1864).
At the trial of defendant for bigamy, the State offered the following -certificate: “This is to certify that A. B., of H., and 0. D., of same place, were by me joined together in holy matrimony on the 1st Janu *499 ary, 1855. (Signed) E. W. A., Minister of the Gospel.” “ In presence of” “Received in the office and recorded Sept. 12th, 1857.” Held, that the certificate is not admissible, because (1) it is not dated % (2) it does not show where the marriage was celebrated; (3) the residence of the minister is not given ; (4) it is recorded nearly three years after the celebration. Even without these objections, a clergyman’s certificate, unsigned by the parties, cannot be admitted in criminal trials, where the defendant is entitled to confront the witness. Judgment reversed. People v. Lambert, 5 Mich. 349 (1858), and a new trial granted.
If the power of the justice to act be limited to his township, the-certificate should show that the marriage took place within the proper township. Murfree on Justices’ Practice, § 55.
See article in Daily Register, June 32, 1879, to effect that notarial certificate of marriage is of no value as evidence, unless it may be as part of the res gestee.
To establish his pedigree, plaintiff in ejectment gave evidence of cohabitation and reputation of marriage of his parents, and offered an afiidavit made out for the purpose of obtaining a special license to be married at a private house, and a fiat signed by the archbishop directing that such license be granted, both produced from the proper ecclesiastical office, and also a copy of a parish register stating the marriage to have taken place at a private house by special license, and purporting to be signed by the parents. The search had been made for the license, and there was proof that such licenses are not kept in any regular custody. Held (against objection that the fiat was only secondary evidence of a document for which no search had been made), that the fiat was admissible as an act done in the course of official duty; the affidavit and register, as proof of the same general fact. Doe Grazobrook, 45 Eng. Com. L. 406.
Foreign certificate or copy.\ A certified copy of a record of a marriage certificate in a sister State, is inadmissible to prove a marriage unless it appears that such record is kept pursuant to a statute. Tucker v. People (Ill. 1886), 7 Northeastern Rep. 51.
A certified copy of a register must be accompanied with proof of ttie statute of the country, showing that such register is required to be kept. Morrissey v. Wiggins Ferry Co., 47 Mo. 521; IIutchins v. Kimmell, 31 Mich. 126.
In a prosecution for bigamy, to prove the first marriage the State offered in evidence a paper purporting to be a certificate of a marriage in another State, signed by a justice of the peace. Held, that it alone was not competent evidence of the marriage, and should be excluded unless accompanied by evidence that there was a justice of *500 that name, and that by the laws of that State a justice has authority to solemnize marriage, and that his signature is genuine. The court below having admitted the certificate in evidence, judgment was reversed, and a new trial granted. Main point. State v. Horn, 43 Vt. 20 (1870).
In an action to recover real estate on a question of legitimacy, plaintiff, to.prove the marriage, offered in evidence an exemplification of a memorandum on the records of a county court in Ohio, which was rejected. The laws of the latter Slate require that a certificate of'marriage shall be returned by the officiating minister or officer to the clerk of the county, by whom it shall be recorded. Held, that the memorandum was properly excluded. An exemplification of the certificate would he admissible. Judgment for defendants affirmed. Niles v. Sprague, 13 Iowa, 198.
In a similar action, plaintiff, to prove her heirship, offered as proof of the marriage of her mother to the decedent, a certified copy, duly authenticated, of the record of the marriage license and certificate of marriage of the minister who celebrated the same, from the county circuit court of the State (Indiana), and at the same time offered the revised statutes of Indiana relative to “ marriage,” and to the “ clerks of the circuit court,” Held, that such testimony is admissible to establish the marriage. Judgment of court below rejecting this evidence reversed. Succession1 of Taylor, 15 La, Ann. 313.
Where a certificate is lost it is not necessary, in order to lot in oral evidence of the contents, that the witnesses should be able to state the contents with entire verbal accuracy. Camden v. Belgrade (Me. 1886), 8 Atl. Rep. 652.
(4) Testimony of one of the spovses.] In the trial of an action by a wife for desertion and non-support, the defendant admitted on the stand that he and the prosecutrix “ had lived together as husband and wife for ten years and a half, but that she could not show a certificate.” Held, that this was an admission which even on an indictment for bigamy, or in an action for crim. eon., would be sufficient proof of marriage. Rule to revoke the order of maintenance discharged. Commonwealth v. Litzenberger, 39 Leg. Int. 198.
On an indictment for adultery the State relied upon proof of the marriage of the woman who was the partieeps criminis, who testified that she was “ married two years ago by 0. L., at his house.” It did not appear that 0. L. professed to be “a justice of the peace, or an ordained or licensed minister of the gospel,” or that the marriage was “ consummated with a full belief on the part of either of the persons married that they Were lawfully married," as required by R. S. c. 59, § 17. Held, that this alone was not sufficient proof of the marriage. *501 Exception by defendant to court’s instruction sustained. State v. Bowe, 61 Maine, 171.
As to the competency of the wife, see Van Tuyl v. Van Tuyl, 57 Barb. 235; People v. Bartholf, 24 Hun, 272; Miles v. U. S., 103 U. S. 304; Wootrich v. Freeman, 71 N. Y. 601.
In assumpsit against one township for the support of a female pauper, the alleged wife of a man living in the defendant township, the pauper and her supposed husband are competent to testify concerning , the fact of marriage. Here it was admitted that the evidence would be admissible in England, but it was contended that fornication being punishable in Massachusetts, the law was different. The court thought that it made no difference. Either may refuse to testify, but liability to punishment is a matter that extends only to the credibility of the witness. The court did not therefore err in overruling an objection to this evidence. (New trial granted to the defendant on other grounds.) Raynham v. Canton, 3 Pick. 293.
Under the rule that a wife is incompetent to testify against her, husband, an alleged wife cannot qualify herself by testifying that she is not such, or to facts that show the alleged marriage to have been illegal, if the fact of such marriage be the question in issue. But if facts establishing the nullity of the alleged marriage be conclusively shown,—as where a prior marriage is uncontested,—then it being no longer contested that she is not his wife, she may testify to the facts concerning the alleged illegal marriage. (Bigamy.) Miles v. U. S., 103 U. S. 304.
(5) Testimony of third persons, eye-witnesses.] Any person present when marriage took place can testify to it. It is enough that he is able to state that the marriage was celebrated according to the usual form, and he need not be able to state the words used, even in criminal prosecutions. See Lord v. State, 17 Nebr. 526; S. C., 23 Northw. 507; Fleming v. People, 27 N. Y. 329; Kopke v. People, 43 Mich. 41; People v. Calder, 30 Mich. 85. A more stringent rule is adopted in State v. Ilodgskins, 19 Me. 155; S. C., 36 Am. Dec. 742, with note.
The fact that a registry or certificate is by statute competent evidence of a marriage does not make it necessary to show that it or a copy cannot be produced in order to let in proof by witnesses. State v. Marvin, 35 N. II. 22.
In a prosecution for bigamy, when the first marriage took place in Pennsylvania and the second in this State, when the law in the former State allowed marriages to be solemnized before 12 witnesses (the certificate of marriage under the hands of the parties and witnesses, one of them a justice of the peace, to be registered in the proper county), the fact of the marriage can be established by parol testimony (as in *502 this case hy one of the witnesses present) without the production of the certificate, or a copy thereof from the register’s office. The question arose on application for writ of error, verdict having been taken against the defendant subject to .the opinion of the court on this and other questions of law. Writ denied. Warner v. Commonwealth, 2 Va. Cases, 95. (1817.)
Testimony of a wife that her husband married a couple at a certain date, with evidence of age and appearance of parties, held admissible where there was a conflict about the date. Betsinger v. Chapman, 24 Hun, 15. But see S. C., 88 N. Y. 487.
(6) A presumption of regularity.] If the principal fact of an official or ecclesiastical act is proved, the presumption of regularity may supply the want of evidence of any necessary incident. Lauderdale Case, p. 439 of this vol.; Piers v. Piers, 2 H. of L. Cas. 331.
The English rule is that this presumption is a legal presumption, and throws the burden of disproof on those who impeach the marriage; and that the disproof must be strong, distinct and satisfactory. Morris v. Davies (above), as corrected in Piers v. Piers, 2 H. of L. Cas. 831.
(7) Disregard of irregularity.] Evident non-compliance with statutory requirements in a marriage, shown by evidence of solemnization, does not prevent the evidence from having effect to establish marriage, unless the statute contains words of nullity. Opinion of Bishop, p. 461 of this vol. Mcister v. Moore, 96 U. S. 76.
II. Indirect proof of marriage, by evidence of
(1) Admissions or declarations of one of the spouses.
(2) Circumstantial evidence.
(8) Cohabitation and repute.
(4) Recognition by members of family.
(5) Documents of pedigree.
(1) Admissions or declarations by one of the spouses.] The great weight of authority is to the effect that admissions of the party prosecuted are admissible to prove marriage, in criminal cases, and that it may be proved by them alone. Miles v. United States, 103 U. S. 304; citing many cases. See Cameron v. State, 14 Alabama. 546; S. C., 48 Am. Dec. 111, with note. Clayton v. Wardell, 4 N. Y. 230, 234 ; Womack v. Tankersley, 78 Va. 242; Camden v. Belgrade (Me. 1886), 3 Atl. Rep. 652.
Such admissions were, however, held not to be sufficient alone. People v. Humphrey, 7 Johns. 314. Declarations of the party who seeks to establish the marriage may be received, if part of the res gestos. Sharon v. Hill, 26 Fed. Rep. 837, 362.
*503 Proof of a general admission by a defendant on trial for bigamy that he “had married A. B." is not evidence of the time and place of such marriage, and, in the absence of evidence to sustain the allegations of time and place alleged in the indictment, will not be sufficient to sustain a conviction. Tucker v. People (Ill. 1886), 7 Northeastern Rep. 61.
On an indictment for bigamy, the admissions of the defendant as to a prior marriage may be given in evidence to prove the fact of marriage.' Being against interest it is admissible. Its sufficiency is another question. The court did not, therefore, err in overruling the objection to such evidence. Affirmed. (This was the sole point.) Wolverton v. State, 16 Ohio, 173; Commonwealth v. Holt, 121 Mass. 61.
The acknowledgment of the husband that he is married, and his cohabitation with the woman as his wife, are proper evidence of- the first marriage, in a prosecution for bigamy. Evidence held to be rightly admitted below, and application for writ of error denied. Morris v. Miller, 4 Burr. 2057, commented upon and distinguished in Warner v. Commonwealth, 2 Va. Cases, 95.
At the trial of the defendant for bigamy, the prosecution having offered evidence of the declaration of the defendant of his first mari riage (he having given public notice that no one was to give credit to “ Mary, the wife of JohnNewton’’), the counsel for defendant contended that the marriage having been solemnized in New York, the prosecutioii was bound to prove the fact of the marriage there, and that it was solemnized according to the New York law. The court refused to so charge and left the question of sufficiency of the proof of marriage by the defendant’s admissions to go to the jury. Yerdict for the defendant. (Nisiprius.) Reg. v. Newton, 2 Moody & R. 503.
On the trial of an indictment for bigamy, the confessions of the defendant, though supported by proof of cohabitation and reputation, are not sufficient to establish the first marriage. Proof of actual marriage, either by the record or by the evidence of an eye-witness, is requisite. The defendant offered no evidence, and the error assigned was the refusal of the court to discharge on the ground of insufficiency of proof of marriage. Reversed. The court said the evidence was admissible, but not sufficient. Following People v. Humphrey, 7 Johns. 314. Whether the general American doctrine, query ? Gahagan v. People, 1 Parker Cr. C. 378; Miles v. United States, 103 U. S. 304.
In an action for crim. con. the plaintiff for the purpose of proving marriage, offered in evidence the declaration of the defendant that he knew A. B. was married to the plaintiff, and that, with full knowledge of that fact, he had seduced her affections and debauched her; verdict having been entered for defendant, the only error assigned was thb
*504 refusal of the court below to admit the above evidence. Held, error. Even in prosecutions for felony or misdemeanor, such a confession is admissible. Reversed. Opinion by Gibson, J., in which he carefully distinguished this from the celebrated case of Morris v. Miller, 4 Burr. 2057; Forney v. Ilallacher, 8 Serg. & R. 159 (1822).
In a prosecution for bigamy, it is competent to prove the former marriage by the declarations and admissions of the defendant. New trial, however, granted on other grounds. Squire v. The State, 46 Ind. 459 (1874) ; see also Williams v. The State, 54 Ala. 131.
Under Gen. St. c. 73, § 89, making competent proof of marriage, “ any circumstantial or presumptive evidence from which the fact may be inferred,” on an indictment for bigamy, in addition to evidence, of cohabitation and reputation, the fact that the alleged former husband made a record of the marriage in his family Bible, and the birth of children who were the issue of such marriage, is sufficient proof. Motion for a discharge on the ground of the insufficiency of the evidence was therefore held correctly denied by the court below. State v. Armington, 25 Minn. 29 (1878).
On the indictment of a Mormon for bigamy, defendant's declarations that A. was his first wife, were received against him, and he admitted in open court that ho had married B. B. was then allowed to testify against him, although the Utah statute forbids a wife to be a witness against her husband. Held, proper to charge the jury that to establish the marriage to A., they might consider the evidence of defendant’s admissions. But error to charge that if they found from all the evidence that B. was a second and plural wife, they might consider her testimony. Miles v. U. S , 103 U. S. 304.
A charge of bigamy in a criminal prosecution cannot bo proved by' any reputation of marriage. There must be proof of actual marriage before the accused can be convicted. But in a civil suit, the confession of a bigamist will be sufficient, when made under circumstances from which no objection to it as a confession can be implied. (Ejectment.) Gaines v. IIennen, 24 IIow. (U. S.) 553.
Where ejectment turned on the question whether deceased had been married to mother of defendant, plaintiff offered declarations of the deceased husband of one of defendants, that his wife’s mother was not married to her father. Excluded. Verdict for defendants. Held, error. Such declarations of members of family are admissible, whether the connection is by blood or by marriage. Jewell’s Lessee v. Jewell, 1 IIow. (U. S.) 219.
B. married 0. in facie ecclesim in 1851, and died in 1872. In an attempt by A. to set up a previous irregular Scotch marriage, a 'witness gave evidence that B. told him after 1851 that A. was his wife, and not *505 C. Held, (1) that such evidence was not admissible; (2) that statements preferred by IX, the plaintiff in an action against B., as alleged husband of A., for A.’s board and lodging, signed by deceased persons, were not admissible. Dysart Peerage Case, L. R. 6 App. Gas. 480.
(2) Circumstantial evidence.] Indictment against man and wom-m for lascivious cohabitation. The sister of the woman testified that she (the woman) in company with a man, left witness’s home declaring that they were going to a clergyman to bo married; that after a sufficient absence they returned, declaring that they were married, an 1 that they lived together until recently as man and wife. On motion by defendant for new trial, it was held that the above was insufficient evidence. It was not the breach that the case admitted of. Verdict set aside. Commonwealth v. Littlejohn, 15 Mass. 103.
In a petition for divorce, the questioa was whether there was sufficient proof of the fact of marriage. Evidence that a man and woman residing at S. had left S. together, stating that they intended to get married at G.; that they returned to S., and stated that they had been married at G.; and that they afterwards cohabited for many years at ti. as husband and wife. Held, no better evidence being procurable, to be sufficient proof. Decree of divorce. Patrickson v. Pacrickson, 1 L. R. (Prob. & Div.) 86 (1866).
(3) Cohabitation and repule.] The two must go together. Maro cohabitation without repute is insufficient. Commonwealth v. Stump, 53 Pa. St. 132; Cargile v. Wood, 63 Mo. 501; Foster v. Hawley, 4 IIun, 63. And repute without cohabitation is insufficient. - Greeuawalt v. McEnelley, 85 Pa. St. 352. S. P., Blair v. IIowell (Iowa, 1886), 28 Northwestern Rep. 199. Cohabitation must be regular and permanent. Yardley’s Estate, 75 Pa. St. 207.
When the nature of the case admits of no hotter evidence, a marriage may be proved by hearsay. Such traditional evidence is not conclusive, hut may establish, prima facie, sufficient for the administration or devolution of property, that there was either a formal marriage, which cannot otherwise be proved, or that the parties agreed per verba de presentí to a marriage which was followed by cohabitation. Chamberlain v. Chamberlain, 71 N. Y. 423.
(4) Recognition in family.] Tnis is of especial weight in questions of legitimacy. Gaines v. Green Pond Mining Co., 32 N. J. Eq. 86.
Uncle describing the child of the parties as his “niece.”" Collins v. Bishop, 48 L. J. Ch. Div. 31.
A letter written by the alleged wife to nephew of husband, congratulating him upon his marriage, expressing the hope to see him, and signed “ aunt,” admissible. Badger v. Badger, 88 N. Y. 546.
In ejectment by alleged heirs at law (nephews, &c.) against the *506 occupant of real estate of the intestate, plaintiff attempted to establish the fact of marriage of their father and mother by evidence of tho declarations of the sister of tho mother that tho parties were married, the property coming from the husband’s brother. Admitted, and exception taken. Held, that although evidence may be given of tho declarations of any deceased member of that family, to which the person from whom the estate descends belonged, yet it is not competent to give the declarations of a person belonging to another family,—such person being connected with the person from whom the estate descends only by an asserted intermarriage of a member of each family. Judgment reversed, for this and other reasons. Blackburn v. Crawfords, 3 Wall. 175.
(5) Documents of pedigree.] Entry of her marriage in prayer book by mother of claimant. Sussex Peerage Case, 11 Cl. & Fin. 85, 98. See Greenleaf Ev. § 104. The rule is restricted to cases of pedigree, Ilainese. Guthrie, L. R. 13 Q. B. Div. 818; see Union v. Plainfield, 39 Conn. 583. See this subject more fully stated in Abb. Tr. Ev. p. 90, &c.
In Williams ®. Williams, G3 Wis. 58, it is held that judgment of divorce, by default, does not establish inter alios tho marriage of the parties.
III. Evidence to disprove marriage.
(1) Impeaching documentary evidence.
(2) Repute of non-marriage.
(3) Admissions.
(4) Facts showing improbability.
(5) Inference from meretricious origin.
(6) Incapacity of a party.
(1) Impeaching documentary evidence.] A certified copy of a marriage license, with the certificate of the marriage, is not, under the sixteenth section of the act of 1829, providing that they shall be “sufficient proof of cither the first or second marriage, in any prosecution under said act” for bigamy, conclusive proof of the marriage. The certificates may be proved to bo forgeries, or acts of unauthorized persons. Evidence by the defendant tending to show that the license was not issued by an authorized person was rejected. Held, error, and new trial granted. Rice v. State, 7 Ilumphrey, 14.
(2) Repute.] Where a formal marriage has boon conclusively proved, evidence to show that the parties were ¿reputed to be not married is not admissible. Northrop v. Knowles, 52 Conn. 522; S. C., 52 Am. Rep. 613.
*507 But if direct evidence of a formal marriage is contradicted, or indirect, evidence is relied upon, it is admissible to show that the reputation was divided. Cunninghams v. Cunninghams, 2 Dow. 482; Barnum v. Barnum, 42 Md. 251, 297; Henderson v. Weis, 25 Grant (U. C.) Ch. 69; see Jones v. Hunter, 2 La. Ann. 254.
But such evidence has been held not to have the effect of preventing the jury from considering all the evidence relating to reputation, as a whole. Greenawalt v. McEnelley, 85 Pa. St. 352; Clark v. Cassidy, 62 Ga. 407 (error to charge that such divided reputation is of no weight).
But in order to make evidence that the alleged husband or wife was reputed to be unmarried admissible, it must be shown that the repute was among persons who knew of the existing cohabitation. Badger v. Badger, 88 N. Y. 546. A general question, therefore, whether the person in question was reputed to be unmarried, is inadmissible. Bartlett v. Musliner, 28 IIun, 235 (where, however, the ruling was put on the ground that this mode of proof was unprecedented).
Where a man introduced a female who was previously living with him as a housekeeper, to his friends as his wife, and from that time for the period of eleven years continued to cohabit with her as his wife, holding her out to the world as sustaining that relation to him, and had several children by her who were called by his name, general reputation as to the character of their intercourse, after it hurl ceased, or the declarations and admissions of the parties subsequent to that time, are not admissible to rebut the presumption of an actual marriage. (Exception to master’s report in the matter of the appointment of a committee for a lunatic.) Matter of Taylor, 9 Paige, 611.
(3) Admissions.] The cases differ as to the effect of such admission. In Tholcy’s Appeal (93 Pa. St. 36), it is said, “all other evidence is of no importance ” against the admissions of the party.” See State o. Worthingham (23 Minn. 528, 535), where such admission was held to be a mere conclusion of law, and not conclusive.
This effect depends to a great extent on the character of the cohabitation proved. See Davis v. Brown, 1 Redf. 259.
They are of less weight in questions of legitimacy than where the question arises -between the parties. In re McLoughlin, 1 Ir. L. R. Ch. Div. 421. But they are admissible in the former case. Murray a. Milner, L. R. 12 Ch. Div. 845.
(4) Facts showing improbability.] Subsequent formal marriage between the parties. Betsinger v. Chapman, 88 N. Y. 487.
Subsequent cohabitation with another. Northfield v. Plymouth, 20 Vt. 582.
*508 Bad character of woman. Chamberlain v. Chamberlain, 71 N. Y. 423.
Separation without apparent cause for rupture. Jackson v. Claw 18 Johns. 440.
(5) Inference from cohabitation, <&c., rebutted by meretricious origin. A relation between a man and a woman, which was illicit at the com mencement, is presumed to continue so until proof of change, and a marriage, therefore, will not be presumed from cohabitation and reputation, where the relation between the parties was of an illicit origin, in the absence of proof of a subsequent actual marriage. Question arose in the orphan’s court in the matter of the distribution of an intestate’s estate, it being denied that the claimant was the widow of the decedent. The cohabitation began during the life of a former wife, without the knowledge of the claimant of this fact. Decree ordering payment to claimant reversed. Hunt’s Appeal, 86 Pa. St. 294. S. P., Harbeck v. Harbeck, 102 N. Y. 714; S. C., 7 Northeastern Rep. 408; aff’g 31 Ilun, 640; Badger v. Badger, 88 N. Y. 546; Floyd v. Calvert, 53 Miss. 37.
(6) Incapacity of a party.] Evidence that the parties were deaf and dumb does not raise a presumption of incapacity; but the burden is still on those who impeach the marriage to show actual resulting incapacity. IIarrod v. IIarrod, 1 Kay & J. 4; S. C., 18 Jur. N. S. 853.
Insanity, to prove marriage void, must be incapacity sufficiently to comprehend the contract or relation to be entered into. See principio stated in IIall v. Unger, 2 Abb. U. S. 507, and Riggs v. Am. Tr. Soc., 19 IIun, 481; and 84 N. Y. 330.
Where it is sought to prove the invalidity of a marriage by evidence of the existence of a previous marriage, the question usually involves a conflict of presumptions on which the cases are in conflict.
Proof of due solemnization of a marriage does not, though aided by the presumption of innocence, preclude proving a prior marriage by circumstantial evidence (except in crim. con. and bigamy). Inhabitants of Camden v. Inhabitants of Belgrade, 75 Me. 26, abst. 28 Alb. L. J. 499 (settlement case).
A subsequent marriage will not alone, though aided by the presunyition of innocence, raise the presumption of a divorce from the prior marriage. Ellis v. Ellis, 58 Iowa, 720; S. C., 13 Northwestern Rep. 65.
The fact that the spouse in a prior marriage was living a short time (in this case a month) before the subsequent marriage, is competent to go to the jury, and sufficient to sustain a finding that the life continued to the time of the second marriage. The presumption of innocence *509 does not ncccssarity, as matter of law, repel the presumption of continuance of life. Commonwealth v. McGrath, 140 Mass. 295; S. C., 6 Northeastern Rep. 515 (bigamy).
The continuance of a cohabitation after the death of a spouse in a prior marriage, whoso continued life had made such cohabitation illegal, docs not alone, in the absence of knowledge of such death, raise a presumption of a contract of marriage after the death, such as to make the continuance of the cohabitation legal. Randlett c. Rice, 141 Mass. 383; S. C., 6 Northeastern Rep. 238 (petition for widow’s allowance).
Nor does continuance of the cohabitation after the lapse of the statutory period, which allows a presumption of death. Estate of Ghio, N. Y. Daily Reg. Feb. 21, 1882 (Rollins, Surr., a well considered case). Contra, Johnson v. Johnson, 114 Ill. 611, abst. Chic. Leg. Adv. Dec. 1, 1885. Compare Murray v. Murray, 6 Oreg. 17; and see 1 Cr. L. Mag. 42.
According to Williams v. Williams (46 Wisc. 464), it is to be loft to the jury whether the cohabitation after the impediment was removed was under the original illegal contract of marriage, or under an actual marriage contracted after the impediment had been removed.
IV. Weight of proof of cohabitation and rtpute.] Cohabitation mid repute, of the na ure hereinbefore indicated, create a strong presumption that a marriage has been celebrated, and this presumption applies with especial force where a question of legitimacy is involved. Piers v. Piers, 2 II. of L. Cases, 331; De Thoren v. Attorney Gen., 1 L. R. App. Cases. 686 ; IIynes v. McDermott, 91 N. Y. 451.
Such presumption, however, is rebuttable. Chamberlain v. Chamberlain, 71 N. Y. 423; IIunt’s Appeal, 86 Penn. St. 294; Port v. Port, 70 Ill. 484; Jones v. Jones, 45 Md. 144.
If there is such contradictory evidence, the question is one for the jury, but the presumption can only be overthrown by clear evidence. See Ilyncs v. McDermott, supra; and Fox v. Bearblock, 44 L. T. R. N. S. 508.
But in Blackburn v. Crawfords (3 Wall. 175), it was held that the law makes no presumption in such case.
Of course, where the action is brought by third parties against the alleged husband or wife, the principle of estoppel may come into operation (Johnston v. Allen, 39 How. Pr. 606). The dictum in Johnson v. Johnson (1 Coldw. [Tenn.] 226), that the principle of estoppel applies even between the parties themselves, is without authority.
In Poet v. Peet (52 Mich. 464), a finding by the court below that the parties had lived together for twenty years, and had had thirteen children, was held equivalent to the finding of a marriage.
o
*510 The presumption is rebutted, as a matter of law, so that the question will be taken from the jury, where the connection is shown to have been illicit ab initio, and it does not appear that the parties even contemplated marriage at some future date, and there is no evidence of any change in the original relation. Cunningham v. Cunningham, 2 Dow. 482. See Clayton v. Wardell, 4 N. Y. 230, 230; Brinkley v. Brinkley, 50 N. Y. 198; Badger v. Badger, 88 N. Y. 546, 554.
If there is some evidence of a change, the matter is for the jury, but they must be instructed that they can find a marriage only if the evidence is such as to exclude any idea that the former connection continued. Foster v. Hawley, 8 Hun, 68.
Where the parties, although knowing that an impediment to their union existed, went through a ceremony of marriage, or it appears in other ways that they contemplated matrimony at some future time, less conclusive evidence is often held sufficient, especially where the legitimacy of children is concerned. Wilkinson v. Payne, 4 T. R. 468; The Breadalbane Peerage Case, L. R. 1 Scotch. & Div. App. Cas. 182; State v. Worthingham, 23 Minn. 528; Caujolle v. Ferrie, 23 N. Y. 90; Hynes v. McDermott, 91 N. Y. 451. See Badger v. Badger, 88 N. Y. 546, 554, to the effect that it is not necessary to show precise time of change (Williams v. Williams, 46 Wisc. 464, applies the more stringent rule laid down in Foster 0, Hawley [supra], to this case).
In Halabaird v. Ins. Co. (2 Dill. 167), it was said that it was proper, in a case where such an invalid marriage existed, to call the attention of the jury to the difference between a recognition of such marriage, and the contracting of a valid marriage. See also State v. Whaley, 10 S. C. 500, 502.
Where the parties, or one of them, did not know on entering into the relation which was entered into from pure motives and not for the mere purpose of sexual intercourse, that an impediment existed, and such impediment has been removed during the continuance of their relation, the presumption will be little, if at all affected, provided the parties learned that they were free to marry. Fenton v. Reed, 4 Johns. 52; Feter v. Feter, 101 Ind. 129; Donnelly v. Donnelly, 8. B. Monr. 113.
That no presumption exists where the parties never learned that the obstacle no longer existed, see Randlett v. Rice, 14 Mass. 385 ; S. C., 6 N. E. Rep. 238. See on this whole subject an article by Guy C. H. Corliss, in 31 Alb. L. J. 106, 126.
Where one of the parties who have lived together as husband and wife, and were known as such, afterward contracts a formal marriage with a third person, the cases differ whether the presumption is destroyed, as a matter of law, so that direct evidence of the former *511 marriage must be given, or whether the jury ean still find a marriage, from the cohabitation and repute alone.
The leading case in whicti the first position is taken is Jones v. Jones, 48 Md. 391 (see 1 Bishop M. & D. § 446). To the contrary Camden v. Belgrade, 75 Me. 126; S. C., 46 Am. Rep. 394; see Archer v. IIaithcock, 6 Jones (N. C.) 421; Brower v. Bowers, 1 Abb. Ct. of App. Dec. 214. In Chamberlain v. Chamberlain (71 N. Y. 423), such subsequent marriage was one of the reasons why the court held, as a question of fact, that the former marriage was not made out.
Where a prior marriage is shown, and the dissolution of the marriage is not proved, subsequent cohabitation and repute is not admis sible to show the dissolution of the prior marriage. Wiseman v. Wiseman, 89 Ind. 479.
That such subsequent cohabitation and repute does not raise any presumption that the former marriage is dissolved, is undoubted where the one who has deserted the other claims that the subsequent cohabitation is legal. Machini v. Lanoni, 5 Redf. 492. Where both prior and subsequent marriages are formal, a divorce from the prior husband may, and according to some casts must, bo presumed. Compare Blanchard v. Lambert, 43 Iowa, 228; Yates v. Houston, 3 Tex. 433, with Ellis v. Ellis, 58 Iowa, 720; Gorman v. State, 23 Tex. 646; Williams v. Williams, 63 Wisc. 58; S. C., 23 Northw. Rep. 110. But this doctrine has not been applied in favor of sustaining a reputed marriage.
Generally, where the illicit commencement of the relation is not affirmatively shown, any evidence tending to show that no marriage was celebrated, is admissible tc rebut the presumption.
The fact that the cohabitation was in a country where concubinage is not considered immoral, was held not of itself to preclude a presumption of marriage from cohabitation and repute, in Sastry Velaider Aronegary v. Sembecutty Vaigalie (44 L. T. R. N. S. 895), reversing the opinion below.

7 Cl. & F. 817.

 7 Id. 842.

 The reference is to the Revised Statutes which were enacted in 1837.

 See p. 443 (above).

 See p. 444 (above).

 For American applications of the maxim communis error facit jus, and the similar maxim that common opinion is good authority on law, see 4 Abb. N. T. Dig., new ed., 322, ¶ 49, 50, vol. 8, 230, ¶ 13. See also the important,case of Adams v. Norris, 23 Ilow. (U. S.) 333.

 See p. 444 (above).

 24 Wend. 587; aff’g 7 Paige, 195.

 Estimated in Winsor's Narr. & Crit. IIist, of A. vol. 3, p. 390, at 3 to 1 in 1665, although the English population on the borders of N. Y. numbered fifteen times that of N. Y.(p. 385.) In 1647 Gov. Stuyvesant reported to the States General that in the whole province there could not be made out two.hundred and fifty, or at farthest, three hundred men capable of bearing arms (Doc. Hist, of N. Y. 468, ed. of 1849, p. 689). In 1643 “ the eight men stated to the Assembly of the XIX. that the freemen exclusive of the English are about two hundred strong,” p. 199, of Doc. relating to Col. IIist, of N. Y. vol. 1. The Dutch house-owners in 1674 (Val. Man. 1853, p. 319), numbered two hundred and thirty-six, English sixty-eight, all others, ten.

 I have not found any definite indication of the proportion between English and Dutch at later periods than above stated.